STATE OF MAINE
*vs.*
F. H. VAHLSING, INC.

Aroostook.    Opinion, April 10, 1952.

*Alexander LaFleur, Attorney General,*
*Boyd L. Bailey, Assistant Attorney General,*
*Ernest L. McLean, Special Counsel,* for state.

*Scott Brown,* for defendant.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

THAXTER, J. This is an action brought by the State of Maine to recover a tax alleged to be due under the provisions of R. S., 1944, Chap. 14, Secs. 206-217, and acts amendatory thereof, for potatoes sold and shipped at Limestone and at Easton, both in the County of Aroostook, during the period beginning December 1, 1947 and ending June 30, 1950. There was a plea of the general issue, together with a brief statement, and the case was heard by the presiding justice of the Superior Court on the writ, pleadings, and agreed statement, who rendered a *pro forma* judgment for the state in the amount of $11,339.23. The case is before the Law Court on an exception to such ruling.

There is no dispute as to the facts. If the so-called potato tax law is a constitutional and valid piece of legislation, the tax is due in the amount claimed for 1,133,923 barrels of potatoes sold and shipped taxed at one cent per barrel.

The tax is attacked on three main grounds: that it imposes an unwarranted burden on interstate commerce; that it is discriminatory, being a specific tax and not being apportioned and assessed equally with other property in the State of Maine according to its just value as required by the Constitution of Maine, Article IX, Sec. 8; that the tax is not levied for a public purpose.

That a tax such as this is not an unwarranted interference with interstate commerce has been settled by a number of important cases and no extended defense of its va-

lidity on this point is really needed. *Sligh* v. *Kirkwood,* 237 U. S. 52, 59 L. Ed. 835; *American Manufacturing Co.* v. *St. Louis,* 250 U. S. 459, 63 L. Ed. 1084; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 82 L. Ed. 823; *C. V. Floyd Fruit Co., et al.* v. *Florida Citrus Commission, et al.,* 128 Fla. 565, 112 A. L. R. 562; see Note 112 A. L. R. *supra,* 571; *State* v. *Enking,* 59 Idaho, 321, 82 Pac. (2nd) 649.

The Michigan court in construing a statute similar to our own, except that it applies to apples instead of potatoes, rather summarily answered this question. The court said in the case of *Kull* v. *Michigan State Apple Commission,* 296 Mich. 262, 296 N. W. 250, 252:

> "While not stressed in the body of their brief, in appellees' counterstatement of questions involved the issue is raised that this act contravenes that portion of article I, sec. 8, of the Federal Constitution which vests in Congress the power to regulate interstate commerce. A sufficient answer is that the act now under consideration does not impose a burden on interstate commerce because it neither impedes nor embarrasses interstate commerce in the commodities involved."

The enforcement of our potato tax act does not cast such a burden on interstate commerce as is prohibited by Section VIII, Article I, of the Constitution of the United States giving to congress the power "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

Our so-called potato tax law was enacted in 1937 and is now grouped with other analogous special taxes in Chap. 14 of Revised Statutes of 1944, the proceeds of which are to be used for certain designated purposes.

Article IX, Sec. 8, of the Constitution of Maine provides as follows:

> "All taxes upon real and personal estate, as-

sessed by authority of this state, shall be apportioned and assessed equally, according to the just value thereof; but the legislature shall have power to levy a tax upon intangible personal property at such rate as it deems wise and equitable without regard to the rate applied to other classes of property."

Counsel for the defendant claims that this tax was assessed in violation of this provision. The potato tax is not a tax assessed on an *ad valorem* basis on the value of potatoes owned, but like the gasoline tax, the use fuel tax, the cigarette tax, and the oleomargarine tax, on the amount of business done in the particular commodity within the state. It is an excise tax and not a property tax and is clearly imposed as an excise tax. This same attack was leveled unsuccessfully against our gasoline tax. See *Opinion of Justices*, 123 Me. 573, 577. Being an excise tax it may be assessed in addition to a property tax, which must clearly be levied in conformity with Article IX, Sec. 8, of the Constitution of Maine. Such has been the decision of all those state courts which have considered the validity of the tax from this point of view. *Louisiana State Department of Agriculture* v. *Sibille*, 207 La. 877, 22 So. (2nd) 202, (La. Apr. 30, 1945); *C. V. Floyd Fruit Co.* v. *Florida Citrus Com. supra; Miller* v. *Michigan State Apple Commission*, 296 N. W. 245, (Mich. Feb. 7, 1941); *State* v. *Enking, supra.* As was said by the court in *Louisiana State Department of Agriculture* v. *Sibille, supra,* at page 205 of 22 So. (2nd), in referring to the distinction between property and excise taxes:

"Under our well established jurisprudence those constitutional provisions apply only to property taxes; they do not control the imposing of license or excise taxes."

We find the following in 51 Am. Jur., page 345:

"The principle that the imposition of both an excise tax on a privilege, activity, occupation, or

calling and an ad valorem tax on property used in the exercise, conduct, or performance of such calling, privilege, or activity is not invalid as double taxation is generally recognized. The principle is bottomed on the theory that the subject of ad valorem taxation is property and that of excise taxation is a right or privilege, and that consequently, the requirement frequently made essential to the existence of double taxation in the unconstitutional sense, namely, that both impositions must be against the same taxable subject, is lacking. The rule has received application in many diverse factual situations. Thus, it is well settled that a state may collect an ad valorem tax on property used in a calling and at the same time impose a license tax on the pursuit of that calling."

Sec. 1 of the potato tax law, now Sec. 206 of Chap. 14 of R. S., 1944, reads as follows:

"The production of potatoes is one of the most important agricultural industries of this state and sections 206 to 217, inclusive, were enacted into law to conserve and promote the prosperity and welfare of this state and of the potato industry of this state by fostering and promoting better methods of production, merchandising, and advertising the said potato industry of this state."

Sec. 207 defines certain terms.

Sec. 208 imposes the tax at the rate of 1¢ a barrel on all potatoes raised in the state, except such as are retained by the grower to be used for home consumption and for seed purposes.

Sec. 209 provides that the tax is due on each lot of potatoes as provided in Sec. 212.

Sec. 210, as amended by Public Laws of 1945, Chapter 30, provides for certain information on certain prescribed forms, and for the issuance of a certificate by the state tax assessor to the shipper, and that "no shipper shall sell or

ship any potatoes as defined in Section 207, until such certificate is furnished as required by this section."

Sec. 211 provides as follows:

"Each shipper purchasing potatoes and paying, or becoming liable to pay, the tax imposed by section 208 shall charge and collect from the seller a tax at the rate of 1¢ per barrel, to be deducted from the purchase price of all potatoes subject to the tax, so purchased by such shipper."

Sec. 212, as amended by Chap. 30, Public Laws of 1945, provides that every shipper shall keep a record of all purchases, sales and shipments of potatoes and shall, on or before the 15th day of each month, render a report to the state tax assessor stating the quantity of potatoes received, sold, or shipped by him during the preceding calendar month, on certain forms furnished by the state tax assessor, and for such further information as the assessor shall prescribe. It also provides that, on or before the 1st day of the calendar month succeeding the filing of said report, each shipper shall pay to the state tax assessor a tax at the rate of 1¢ per barrel upon all potatoes so reported as purchased, sold or shipped, as determined by the state tax assessor.

Sec. 213, as amended by Public Laws of 1945, Chap. 30, provides for inspection by the state tax assessor, his agent, or the commissioner of agriculture.

Sec. 214 provides for certain penalties.

Sec. 215 provides for the appropriation of moneys received by the treasurer of state as follows:

I. For the collection of the tax and the enforcement of all the provisions of the law.

II. 25% of the money collected for investigation of better methods of production, shipment and merchandising of potatoes, and for the manufacture and merchandising of

potato by-products by the Maine Agricultural Experiment Station under the supervision of the Maine Development Commission.

III.   25% of the sum collected for the general purpose of merchandising and advertising of Maine potatoes for food and for seed purposes under the direction of the Maine Development Commission.

IV.   This subsection provides that the funds remaining after paying the expenses of carrying out the provisions of sections 206-217, inclusive, including expenses authorized under the provisions of subsections II and III of this section, "may be expended by the commission to carry out the purposes outlined in said subsections as it may determine."

Sec. 216 provides for changes in membership of the Maine Potato Tax Committee.  Four of the five members shall be residents of Aroostook County, and one a resident of central Maine.  This committee shall work with the Maine Development Commission in an advisory capacity to assist in enforcing the provisions of the act.

Sec. 217 provides that the taxes imposed by the act shall be in addition to any other taxes legally imposed or collected under other provisions of the law of the state now or hereafter in force.

We must bear in mind that the entire amount received from this tax beyond that required for expenses of collection of the tax, and for administration purposes, is to be used for the purpose of investigating and determining better methods of production, shipment, and merchandising of potatoes and for the manufacture and merchandising of potato by-products by the Maine Agricultural Experiment Station under the supervision of the Maine Development Commission; and for merchandising and advertising Maine potatoes for food and for seed purposes under the direction of the Maine Development Commission.  In other words,

these funds are to be used for agricultural research and education in the State of Maine, and for advertising *Maine potatoes,* a distinctive and substantial *Maine product.* True the subject matter of this research is specialized and confined to a single crop. That crop, however, is of such magnitude that there cannot be any doubt that it affords a proper field for specialized research and education. The allocation of a portion of the funds raised by the tax to advertising the product is but a method of assuring to those taking advantage of the research a market for the product.

This law, as we have said before, was enacted first in 1937, Public Laws, Chap. 84, and is now found substantially in its original form in R. S., 1944, Chap. 14, Secs. 206-217. Sec. 1 as originally enacted, now Sec. 206 of the Revised Statutes, expresses in straightforward language the honest purpose of the 88th Legislature in enacting this law. The act needs no interpretation by us. We must bear in mind that the entire amount received from this tax beyond that required for expenses of collection and administration is to be used by the Maine Agricultural Experiment Station under the supervision of the Maine Development Commission to investigate and determine better methods of production, shipment, and merchandising potatoes; and for merchandising and advertising Maine potatoes for food and for seed purposes. In other words, so far as used for advertising, these funds are to be used for advertising the State of Maine by advertising the *Maine potato,* a typical and distinctive product of this state, the raising of which constitutes one of our basic industries.

As we acknowledged in a very recent case, the presumption is in favor of the constitutionality of an act approved by the legislature. In *Morris* v. *Goss,* 147 Me. 89, 94, 83 A. (2nd) 556, 559, we find the following language:

"Furthermore, except in extraordinary cases the Court will rely upon the presumption of the

constitutionality of legislative action and not even examine the question unless a determination thereof is strictly necessary to a decision disposing of the cause before it for determination."

This tax has been in force now for over fourteen years in the belief that the collection of it was valid; the Maine Potato Tax Commission has been financed through its revenues; advertising throughout the country of Maine potatoes has been carried on under the supervision of the Maine Development Commission, at a time when Maine potatoes are under severe competition with those from Idaho and elsewhere. Similar legislation has been already passed by the legislature of Idaho and approved as constitutional by the court there. *State* v. *Enking, supra.* In addition it has met with approval in the states of Florida, Louisiana and Michigan. In Florida it applies to citrus fruits, *C. V. Floyd Fruit Co.* v. *Florida Citrus Commission et al., supra;* in Louisiana to sweet potatoes, *Louisiana State Department of Agriculture* v. *Sibille, supra;* in Michigan to apples, *Miller* v. *Michigan State Apple Commission, supra.* Everywhere it has been held that such a tax is an excise tax, and that to be held valid as such it must be levied for a public purpose. The language of the Louisiana court is similar to that of all the others. It says, 22 So. (2nd) 206:

"The declaration that the act was passed to promote the prosperity and welfare of the State of Louisiana and of its people is an expressed legislative recognition that the tax is imposed for a public benefit. To be sure, that recognition is not conclusive; it could not make the tax one for public purpose if in fact it were for a private purpose."

Where the industry involved has been of sufficient size and importance, and especially where the welfare of agriculture has been concerned, a tax levied for its support such as this, to wit, a tax for the benefit of agriculture as an industry, as distinguished from grants to those engaged there-

in, has almost invariably been held as levied for a public use. It is significant that the meaning of the words "public use" has been liberally interpreted in this state. *Laughlin* v. *City of Portland*, 111 Me. 486. The question in the *Laughlin* case was whether the legislature had the constitutional power to authorize a city to establish a municipal fuel yard. In answering that question in the affirmative, this court said, pages 491-492:

> "The courts have never attempted to lay down with minute detail an inexorable rule distinguishing public from private purposes because it would be impossible to do so. Times change. The wants and necessities of the people change. The opportunity to satisfy those wants and necessities by individual effort may vary. What was clearly a public use a century ago, may, because of changed conditions, have ceased to be such today."

\* \* \*

> "On the other hand, what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today. Laws which were entirely adequate to secure public welfare then may be inadequate to accomplish the same results now."

Admittedly the line of demarcation between a public and a private use is not always easy to draw. Whether a use is public or private is a question of law for the court. This question must be determined by the application of established legal principles to the then existing facts. The statement of this court, when it said, "what could not be deemed a public use a century ago, may, because of changed economic and industrial conditions, be such today" is not to be interpreted as a declaration by this court that the meaning of the constitution changes with the ebb and flow of economic events. What we meant by that declaration is that the constitution is made up of living words, and that the change of the nature of economic events may, within the

established principles of constitutional construction, transform a use which was formerly a private use into a public use. The transformation, however, is brought about not by a change in the meaning of the constitution but by a change in the situation which brings the particular use within the established meaning of a public use under the constitution.

The promotion of the agricultural industry has been a recognized governmental activity in this state for many, many years and money raised by taxation for the benefit of agriculture as an industry, as distinguished from direct grants to those engaged therein, has been provided by legislative action. As long ago as 1885 there was established in connection with the State College of Agriculture and Mechanic Arts, the Maine Fertilizer Control and Agricultural Experiment Station originally to protect farmers from frauds in commercial fertilizer and to promote agriculture by scientific investigation and experiment. Public Laws of 1885, Chap. 294. This station was placed under the control and management of a board of managers of five members, of whom one was the professor of agriculture of the State College of Agriculture and Mechanic Arts, another the Secretary of the State Board of Agriculture, and three more appointed by the governor. The purpose of such legislation was avowedly to protect and advance the agricultural interests of this state. Two years later this act was formally repealed and another passed to integrate and coordinate such work with the efforts of the federal government in the same direction. Public Laws of 1887, Chap. 119. We all know that every legislature since then has appropriated money for the furtherance of these original purposes. The Maine Development Commission was established in 1933 and $50,000 was appropriated by the state to it to further its work to advertise and publicize the agricultural, industrial and recreational resources of this state. This legislation is now found in R. S., 1944, Chap. 35.

Is it possible that after the lapse of nearly seventy years, since the enactment of the original legislation, anyone has the temerity to argue to us that this legislation was beyond the power of the legislature to enact, and that all appropriations for these purposes since the passage of the original act were void because the money was not appropriated for a public purpose? And yet they must so argue if they expect us to hold the potato tax law invalid on that ground. The Nebraska court has had this same problem before it and disposed of it by the following language: *Power Oil Co.* v. *Cochran* (Neb. 1941), 295 N. W. 805, 811, et seq.:

"The constitutionality and validity of the appropriation of the $50,000 for the Nebraska Advertising Commission, we think, must depend on the question of the constitutionality of the act creating the commission. The two must stand or fall together. It is hardly necessary to state that an appropriation of public funds for the sole purpose of making effective an unconstitutional law is void.

"The creation by legislative action of a commission to function at public expense to advertise the products of the state and its advantages with the purpose of attracting tourists and industries is something new in this state and, perhaps, in its scope, is more far reaching than legislation of this character in any other state. However, the principle of state advertising is not new, even in this state. The principle and practice of state advertising extends back into antiquity. This fact is pointed out graphically in the opinion in City of Jacksonville v. Oldham, 112 Fla. 502, 150 So. 619. The principle has been recognized in State v. Cornell, 53 Neb. 556, 74 N.W. 59, 39 L.R.A. 513, 68 Am. St. Rep. 629; Board of Directors of Alfalfa Irrigation District v. Collins, 46 Neb. 411, 64 N.W. 1086; State v. Robinson, 35 Neb. 401, 53 N.W. 213, 17 L.R.A. 383; State v. Miller, 104 Neb. 838, 178 N.W. 846. It is true that the cases have reference to expenditures for advertising by counties, but

counties are only arms of the state. The rules announced are not grounded in any sense in county organization but on the principle that legislative power exists to make expenditures for advertising which is for the public benefit. The courts of certain other states have adopted a similar attitude toward advertising in the interests of the public welfare at public expense. City of Jacksonville v. Oldham, supra; C. V. Floyd Fruit Co. v. Florida Citrus Commission, 128 Fla. 565, 175 So. 248, 112 A.L.R. 562; State v. Enking, 59 Idaho, 321, 82 P. 2d 649; City of San Antonio v. Paul Anderson Co., Tex. Civ. App. 41 S.W. 2d 108; Anderson v. City of San Antonio, 123 Tex. 163, 67 S.W. 2d 1036; Moreland v. City of San Antonio, Tex. Civ. App. 116 S.W. 2d 823; Davis v. City of Taylor, 123 Tex. 39, 67 S.W. 2d 1033; Sacramento Chamber of Commerce v. Stephens, 212 Cal. 607, 299 P. 728; Lewis v. LaGuardia, 172 Misc. 82, 14 N.Y.S. 2d 463.

"In this field, if limited to the public benefit, the legislature has power to act. Whether it enters the field or not is a matter of legislative discretion. Whether or not the legislature exercised a wise discretion is not a matter that can properly be determined by the courts. The legislature, subject only to the initiative and referendum, and constitutional inhibitions, and provided that legislation is for a public purpose, has an unlimited field within which to legislate."

This potato tax was imposed for a public purpose, and because in the opinion of the legislature the public exigencies required it; at least we must so hold where the industry for the benefit of which the tax is levied is as important and as basic as is the potato industry to the State of Maine which imposes the tax. The mere fact that the proceeds of this tax are to be expended primarily for the benefit of the industry on which the tax is levied does not of itself render the law constitutional; for such an argument would justify

almost any tax so long as the particular industry for whose benefit the tax is primarily enacted pays the bill. What justifies the tax is that the money expended for the promotion of the potato industry is not primarily expended for the benefit of those individuals engaged therein but for the benefit of the people as a whole by making available to any and all who may wish to enter into the industry the specialized knowledge and information that will enable them to carry the same on, and prospects of a market for that which they produce. The line of demarcation between the expenditure of public funds for the benefit of the individual in order to get an indirect resultant benefit to the people as a whole, and the expenditure of public funds for the benefit of the people as a whole with incidental benefits accruing to individuals may be extremely delicate and hard to discover. To formulate a general rule to cover all situations is neither possible nor do we attempt to do so.

It is to be presumed, however, that when the legislature levies a tax and appropriates the proceeds thereof for a purpose which it declares to be for the public welfare that it has acted in good faith and within its constitutional powers. Unless it has clearly exceeded its constitutional powers in so doing, its action must be sustained. All rational doubts as to the constitutionality of statutes must be resolved in favor of the constitutionality thereof. Although it is the duty of the court to declare acts which transcend the powers of the legislature void, this judicial duty is one of gravity and delicacy and it is only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute that the inherent power of the court to declare statutes unconstitutional should be exercised.

It is the considered opinion of this court that the primary purpose of the enactment of this act is the promotion of the welfare of the people of the state as a whole; that it is enacted for a public purpose and that the fact that those en-

gaged in raising potatoes may be incidentally benefited thereby does not change the purpose of the act from a public one to a private one. As said by the Supreme Court of the United States in *Loan Ass'n* v. *Topeka*, 20 Wall. 655, 664, 22 L. Ed. 455:

> "It is undoubtedly the duty of the legislature which imposes or authorizes municipalities to impose a tax to see that it is not to be used for purposes of private interest instead of a public use, and the courts can only be justified in interposing when a violation of this principal is clear and the reason for interference cogent. And in deciding whether, in the given case, the object for which the taxes are assessed falls upon the one side or the other of this line, they must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."

Measured by this standard, the excise tax now under consideration is levied for a public purpose and the act imposing the same is constitutional.

The entry must be

*Exceptions overruled.*