STATE OF MAINE
*vs.*
GEORGE LASKY

Kennebec.    Opinion, October 12, 1960.

*Ralph W. Farris, Asst. Atty. General,* for state.

*Harold J. Rubin,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ. DUBORD, J., did not sit.

WILLIAMSON, C. J. On report. The State seeks to recover the "quahog tax," so-called, assessed against the defendant, a licensed shellfish dealer, under the provisions of R. S., c. 16, §§ 294-301, enacted in P. L., 1957, c. 429, § 22. It is agreed that if the quahog tax statute is "constitutional and a valid exercise of the taxing powers of the State," the State is entitled to judgment in the amount of $1282.02.

The defendant contends that the quahog tax is unconstitutional for two reasons: first, that the statute originated in the Senate and not in the House of Representatives, in violation of Art. IV, Sec. 9, of the Constitution of Maine, and hence was not validly enacted; second, that the tax is not levied for a public purpose.

Art. IV, Part Third, Sec. 9 of the Constitution reads:

"Bills, orders or resolutions, may originate in either house, and may be altered, amended or rejected in the other; but all bills for raising a revenue shall originate in the house of representatives, but the senate may propose amendments as in other cases: *provided,* that they shall not, under color of amendment, introduce any new matter, which does not relate to raising a revenue."

We will consider only the two issues stated above. In no way do we intimate by our decision what our judgment

might be in the event of an attack on the constitutionality of the quahog tax statute on grounds not here presented. The pertinent statutory provisions in R. S., c. 16 read as follows:

"**Sec. 294. Purpose.**—The quahogs in Maine constitute a renewable natural resource of great value to the Casco Bay coastal region and the state, and sections 294 to 301 are enacted into law in order that funds may be available to the research division of the sea and shore fisheries department to cooperate with the coastal communities in paying for the purchase, maintenance and operation of boats and equipment to transplant seed quahogs from heavy concentrations to commercially depleted shellfish areas, and carry on other management and scientific work deemed necessary for the financial benefit of the industry.

"**Sec. 295. Definitions.**—The terms used in sections 294 to 301 shall be construed as follows:

**I.** 'Quahogs' shall mean a marine mollusk (Venus mercenaria) commonly called hard shelled clams.

**II.** 'Primary producer' shall mean any person who digs or takes quahogs from the flats or waters of the coast of Maine for commercial purposes.

**III.** 'Shellfish dealer' shall mean any person, partnership, association, firm, corporation or entity holding a sea and shore fisheries department wholesale seafood dealer's and processor's license or a resident or nonresident interstate shellfish transportation license engaged in buying quahogs from the primary producers and dealing in quahogs in the wholesale trade.

**IV.** 'Landed value' shall mean the price payable to the primary producer by the shellfish dealer for quahogs dug or taken from the coastal waters.

"Sec. 296. **Tax on quahogs.**—There is levied and imposed a tax at the rate of 5% on the landed value of all quahogs purchased from the primary producers by shellfish dealers."

\* \* \* \* \* \* \* \* \* \* \*

"Sec. 301. **Appropriation and use of moneys received.**—Money received under the provisions of sections 294 to 301 by the treasurer of state shall be appropriated and used for the following purposes:

I. For the collection of the tax provided for by section 296 and for the enforcement of all the provisions of sections 294 to 301.

II. The balance in such amounts as shall from time to time be determined by the commissioner of sea and shore fisheries:

A. For the purpose of buying, maintaining and operating boats and equipment to transplant seed quahogs to flats and waters of the state.

B. To carry on scientific and management work deemed necessary for the benefit of the quahog industry. Any unexpended balance from the above apportionment shall not lapse, but shall be carried forward to the same fund for the next fiscal year."

The first objection, namely, that the quahog tax as a bill "for raising a revenue" was not validly enacted inasmuch as it was introduced in the Senate, arises in this manner. The quahog tax was first enacted at the regular session of the 1957 Legislature in P. L., 1957, c. 355, as Revised Statutes c. 16, §§ 282-289, effective in due course in August 1957. At a special session in October 1957 the Legislature enacted "An Act to Correct Errors and Inconsistencies in the Public Laws" (P. L., 1957, c. 429), effective on approval under the emergency clause. Art. IV, Part Third, § 16, Maine Constitution.

In the correcting statute we are interested in the following sections:

> "**Sec. 21. R. S., c. 16, §§ 282-289, repealed.** Sections 282 to 289 of chapter 16 of the Revised Statutes, as enacted by chapter 355 of the public laws of 1957, are hereby repealed.
>
> "**Sec. 22. R. S., c. 16, §§ 294-301, additional.** Chapter 16 of the Revised Statutes is hereby amended by adding thereto 8 new sections to be numbered 294 to 301, to read as follows: . . ."

There follows the precise language of the original act of the regular session (in terms repealed in Section 21 above) apart from changes in the section numbers of R. S., c. 16.

The correcting act consists of 98 sections touching many subjects. For our purposes we need consider only sections 21 and 22, above. The two "quahog" sections neither affect nor are they affected by the remaining 96 sections.

Sections 21 and 22 obviously must be considered together. No one would suggest that the Legislature intended to repeal the first or original quahog tax in section 21 without enacting the correcting section 22. No new revenue was provided in the correcting act not previously in existence until the very moment of the effective date of the Act.

A bill to repeal the quahog tax, taken alone, would not be a bill to raise revenue. There is no constitutional prohibition against the origination of such a measure in either branch of the Legislature. If, however, repeal was the purpose of the Legislature in the October 1957 session, we would not expect to find the repeal hidden in an act with 98 sections designed "to Correct Errors and Inconsistencies in the Public Laws."

A bill to create a quahog tax as provided in the first act (P. L., 1957, c. 355), taken alone, however, would be a bill to raise revenue under the Constitution. The first or orig-

inal act goes beyond the bounds of a regulatory measure and provides for revenue from the quahog tax. The purpose of the tax is not to regulate the shellfish dealers, but to provide funds for the benefit of the quahog industry and thus the State.

If the issue before us was whether a bill providing for a quahog tax, taken alone, could be introduced only in the House, we would be called upon to determine whether the point could be raised in court, and if so, in what manner.

In *Weeks* v. *Smith,* 81 Me. 538, 547, 18 A. 325 (1889), we said

> "But when the original act, duly certified by the presiding officer of each house to have been properly passed, and approved by the governor, showing upon its face no irregularities or violation of constitutional methods, is found deposited in the secretary's office, it is the highest evidence of the legislative will, and must be considered as absolute verity, and cannot be impeached by any irregularity touching its passage shown by the journal of either house."
>
> \* \* \* \* \* \* \* \* \* \* \*
>
> "The enrolled act, if a public law, and the original, if a private act, have always been held in England to be records of the highest order, and, if they carry no 'death wounds' in themselves, to be absolute verity and of themselves conclusive."

In 1935 the justices of the court, in 133 Me. 537, 539, 178 A. 620, joined in an opinion to the House of Representatives that a bill, "An Act Relative to Resident Fishing and Hunting Licenses", was "regulatory. . . " and not a bill for " 'revenue' which should have originated in the House of Representatives."

The opinion of the justices is not in conflict with the *Weeks* case, *supra*. In *Weeks,* the court declined to look behind the endorsement of a veto on the act as passed by the

Legislature. In the Opinion of the Justices, advice was sought by the House in the course of the legislative process.

We deem it unnecessary, however, to consider the place of origin of the correcting act. To say that in October 1957 the Legislature in one breath repealed the quahog statute, effective only since August 1957, and enacted as something new the same statute, identical in all respects apart from section numbers, gives weight only to the form of words and figures and not to the true intent of the Legislature. Sections 21 and 22, the repeal and enactment sections, accomplish neither more nor less than the amendment of the original quahog tax statute by changing the assignment of section numbers in the Revised Statutes. In *Stuart* v. *Chapman*, 104 Me. 17, 24, 70 A. 1069, the court said:

> "We apprehend that no man can have any doubt that this is precisely what the legislature intended to accomplish. The means it adopted were appropriate to the end, and we know of no iron rule of statutory interpretation which, under the circumstances of this case, must render its efforts abortive."

The reason for the correction (but not the need at the particular time) is found in the printed laws of the 1957 regular session. "An Act Imposing a Tax on Dry Beans" (P. L., 1957, c. 326), effective September 1, 1957, added twelve sections to Revised Statutes, c. 16, numbered 282 to 293. By "An Act Providing for a Tax on Quahogs," P. L., 1957, c. 355, effective August 28, 1957 (the first quahog tax), eight sections were added to the same Revised Statutes, c. 16, numbered 282 to 289.

Quahogs were thus given sections already occupied by dry beans. It is not surprising that an error of this nature should arise in the process of legislation. No harm came therefrom.

It would be absurd to say either that the quahog tax repealed the dry bean tax by implication or that the quahog tax failed because of confusion in numbering the sections. No more can it be said that the Legislature, in correcting the error, repealed the existing quahog tax.

All that the Legislature in fairness sought to accomplish, and did accomplish, was to give the quahog tax statute eight sections in the Revised Statutes c. 16 following the twelve sections of the dry bean tax statute. This result no doubt could have been reached by a simple amendment of the original quahog tax. It would be a strange result indeed if in correcting what was considered to be an error or inconsistency, the Legislature deprived the State of a source of revenue and the continuance of an activity.

To summarize, we are of the opinion that the statute (P. L., 1957, c. 429, § 22) at least insofar as it amended the original quahog tax statute, was not a bill to raise revenue within the meaning of the Constitution. Therefore we need not consider in what branch of the Legislature the measure was introduced.

We turn to the issue concerning the purpose of the quahog tax. Unless the tax is levied for a public purpose, and not for a private purpose, it must fail under the Constitution.

The State contends that validity of the tax is assured upon application of the principles set forth in the opinion of the court in *State* v. *Vahlsing*, 147 Me. 417, 88 A. (2nd) 144, sustaining a tax on potatoes to support the potato industry. On his part, the defendant stoutly asserts that the quahog industry is so far different from the potato industry that *Vahlsing* does not control.

We take judicial notice of the great importance of the fishing industry in the life of our State. *State* v. *Dodge,* 117

Me. 269, 104 A. 5 (lobster fisheries). The well being of large numbers of our citizens is directly dependent upon it. From colonial days we have drawn upon the sea and shore fisheries for a substantial part of our income and wealth.

The power of the Legislature "to regulate and control such fisheries by legislation designed to secure the benefits of this public right in property to all its inhabitants" has long been unquestioned. *State* v. *Leavitt,* 105 Me. 76, 79, 72 A. 875 (digging of clams). See also *Moulton* v. *Libbey,* 37 Me. 472, and *State* v. *Peabody,* 103 Me. 327, 69 A. 273, both involving the digging of clams.

The Legislature has stated that quahogs "constitute a renewable natural resource of great value to the Casco Bay coastal region and the state." Sec. 294, *supra.* This finding of fact by a coordinate branch of the state government is entitled to the greatest respect.

The defendant seeks to distinguish the quahog tax from the potato tax, upheld in *Vahlsing, supra,* in part, upon the unimportance of the quahog compared with the potato. We may readily agree that the quahog industry does not match in size the potato industry. We are left, however, with the fact found by the Legislature, as stated above. The defendant gains nothing from the argument about the size of the quahog industry.

The defendant further contends that the tax is not levied for the benefit of *fishing* as an industry, but for the benefit of a small group of *individuals* in the industry. There is nothing in the language of the act or in the record to compel this view. The purpose of a tax to benefit the public through benefit to the industry is not to be denied for the reason that the numbers engaged in the industry may be relatively small. The purposes set forth by the Legislature in Section 294 are expressly designed to be of financial benefit to the industry, and hence to the State.

The quahog act, the defendant correctly points out, makes no provision for the promotion and advertising of quahogs. In this respect the potato act has broader scope, and promotion and advertising are of great importance. We know, however, of no rule that requires in matters of this nature that promotion and advertising be made necessary purposes.

The defendant dismisses the experimental work proposed by the act as benefiting only the individuals primarily concerned with the digging and taking of quahogs, and no others. We read the act quite differently and find therein a broad purpose to restock the shores for the benefit of the shellfish industry in years ahead and thus of all those who may be engaged therein.

The increase in volume of potatoes marketed by reason of the potato tax law benefits those directly engaged in the business. So here the availability of more and better quahogs on the market will benefit diggers and shellfish dealers. The Legislature saw beyond this limited area and recognized that benefits would reach the citizens as a whole. The purpose is not plainly and unmistakably to benefit only the industry, but to bring benefits to all.

There is no necessity to repeat here the reasoning so aptly given in the opinion of Justice Thaxter in *Vahlsing, supra.* On page 425, the court said, in language here applicable to the quahog industry:

> "Where the industry involved has been of sufficient size and importance, and especially where the welfare of agriculture has been concerned, a tax levied for its support such as this, to wit, a tax for the benefit of agriculture as an industry, as distinguished from grants to those engaged therein, has almost invariably been held as levied for a public use."

We have approached this issue, bearing in mind the presumption in favor of the constitutionality of a statute. In *Vahlsing, supra,* we said at p. 430:

"It is to be presumed, however, that when the legislature levies a tax and appropriates the proceeds thereof for a purpose which it declares to be for the public welfare that it has acted in good faith and within its constitutional powers. Unless it has clearly exceeded its constitutional powers in so doing, its action must be sustained. All rational doubts as to the constitutionality of statutes must be resolved in favor of the constitutionality thereof. Although it is the duty of the court to declare acts which transcend the powers of the legislature void, this judicial duty is one of gravity and delicacy and it is only when there are no rational doubts which may be resolved in favor of the constitutionality of the statute that the inherent power of the court to declare statutes unconstitutional should be exercised."

See also *McGary et al.* v. *Barrows et al.*, 156 Me. 250, and cases cited.

In short, the tax, in our view, is levied for a public purpose and hence stands against the attack made by the defendant.

The entry will be

*Judgment for State in the amount of $1282.02.*