BOSTON MILK PRODUCERS INC.
et al.

v.

J. L. HALPERIN et al.

Supreme Judicial Court of Maine.

Argued Jan. 20, 1982.
Decided May 20, 1982.

Petrucelli, Cohen, Erler & Cox, Joel C. Martin (orally), Portland, for plaintiffs.

Lipman, Parks, Livingston, Lipman & Katz, P. A., Roger J. Katz (orally), Sumner H. Lipman, Augusta, for intervenors.

Cabanne Howard (orally), Christine Foster, Asst. Attys. Gen., James E. Tierney, Atty. Gen., Augusta, for defendants.

Before McKUSICK, C. J., and GODFREY, NICHOLS, ROBERTS, CARTER and VIOLETTE, JJ.

GODFREY, Justice.

An exaction called the "milk tax" has been imposed in Maine since 1953.[1] 36 M.R.S.A. ch. 707. The tax is levied on dealers, who may collect it from milk producers by deducting the amount of the tax from the purchase price. 36 M.R.S.A. §§ 4505, 4506. The revenue is used by the Maine Dairy Promotion Board (formerly the Maine Milk Tax Committee) for collection and enforcement of the tax itself and for promotion of the dairy industry. 36 M.R.S.A. § 4511.[2] The tax rate, established by section 4505 of title 36, was increased by legislation in 1967 and 1969.[3]

In 1979, the legislature enacted chapter 452 of P.L. 1979, providing, among other things, for repeal of old section 4505, which set a flat rate of five cents per hundredweight, and enactment in its place of a new section 4505 establishing a floating rate based on the average annual Class 1 price paid to Maine producers by Maine dealers for milk of 3.5 per cent butterfat content. However, section 9 of chapter 452 provided explicitly that the *act* was not to take effect unless the new tax was approved by a majority of "certified" Maine milk producers.[4] The statute required the ballots for

---

[1]. P.L. 1953, ch. 393, eff. Aug. 8, 1953.

[2]. The purpose of the milk act tax is stated in 36 M.R.S.A. § 4501 (1978) as follows:

The production of milk is one of the most important agricultural industries of this State, and this chapter is enacted into law to promote the prosperity and welfare of this State and of the dairy industry of the State by the fostering of promotional, educational, advertising and research programs of the said dairy industry of the State.

[3]. P.L. 1967, ch. 269, § 1; P.L. 1969, ch. 213, § 1.

[4]. P.L. 1979, ch. 452, § 9 provided as follows:

Sec. 9. Effective date. This Act shall not take effect unless the producers required to pay the tax have approved the tax by an affirmative vote. At least 51% of the producers eligible to vote must vote and a majority of that number must vote in the affirmative. The Commissioner of Agriculture shall mail a ballot and copy of this Act and a self-addressed stamped envelope, within 30 days after the effective date of this Act, to each producer required to pay the tax, whose name appears on a list certified to him to be accurate, according to available information, by the Division of Inspections. The question on the ballot shall be as follows:

"Shall a tax be levied and imposed on all certified producers at the rate of .8 of 1% of

this vote to be mailed "within 30 days after the effective date of this Act" (*sic!*) and to be returned within fifty days of the mailing. The wording of the ballot set forth in the statute included a certification by the voter that he was a ·producer of milk in Maine.

On September 24, 1979, a ballot with a cover letter dated September 21, 1979, was mailed to 1,095 milk producers. It did not provide for the producer's certification of his status. On October 9, a certification form was sent to those producers from whom votes had already been received. On the same day, a corrected ballot was sent to those producers from whom no vote had been received. The required certified mailing list of producers used on September 24 was obtained from the Division of Inspections of the Department of Agriculture under cover of a letter dated October 5, 1979.

The mailing was conducted under the immediate supervision of the director of the Maine Dairy Promotion Board, which was to be established by section 2 of P.L. 1979, ch. 452. As the ballots were returned, the director and his staff recorded the votes. He informed members of the Grange and the Farm Bureau, both groups interested in the outcome of the election, about the number of returns as they came in.[5] There were various other irregularities in the ballot language and voting procedure.

The results of the voting showed 632 certified ballots, with 369 voting yes (58.4%) and 263 voting no (41.6%). This result was certified, as required by the act, to the state tax assessor by the Commissioner of the Department of Agriculture on November 21, 1979. The increased tax supposedly became effective January 1, 1980. The immediate effect of the increase was to double the tax paid. The increased tax was paid by all members of the corporate plaintiff and by the individual plaintiff.

The present action was brought on March 20, 1981. The plaintiffs are one individual Maine dairy farmer and a Maine corporation whose members are Maine dairy farmers, all of whom produce milk for sale in Massachusetts. The individual plaintiff and all members of the corporate plaintiff paid the increased tax after January 1, 1980. The plaintiffs did not bring any action under the Administrative Procedure Act, 5 M.R.S.A. ch. 375, to review the action of the state officers concerned. The defendants are the state tax assessor and the state treasurer. Three groups of Maine producers of milk for the Maine market petitioned to intervene in Superior Court.[6]

The plaintiffs, having paid the tax from January 1980 to the time of bringing the action, sought, among other things, to ob-

---

the average Class 1 price per hundredweight, rounded to the nearest 10th of 1%, paid to Maine milk producers by Maine milk dealers for milk of 3.5% butterfat content during the previous calendar year on all milk produced or imported for sale within this State, except milk consumed on the farm where produced?"

　　[ ]　Yes　　　　[ ]　No

I hereby certify that I am a producer of milk in Maine.

If this farm is a partnership or is incorporated, I am authorized to cast this ballot in behalf of that partnership or corporation.

　　——————————————————
　　Signature of Producer

　　——————————————————
　　Signature of Witness

The commissioner shall review the returns received by him within 50 days after the date of mailing the ballots to the producers and certify to the State Tax Assessor the results of the election.

If a majority of those producers voting approve the provision, section 3 of this Act which repeals and replaces the Maine Revised Statutes, Title 36, section 4505, the Act shall take effect on January 1, 1980.

5. The director testified, however, that he did not tell them the number of votes on each side or identify the voters.

6. The petitioners to intervene were Agri-Mark, Inc., Maine Farm Bureau Associates, and Save Maine Farms. No order of the Superior Court appears to have been entered permitting those petitioners to intervene, although their petition, which was itself docketed, bears an initialed handwritten notation "Motion granted". *See State v. Baker*, Me., 390 A.2d 1086, 1088–89 (1978); *Torrey v. Full Gospel Church*, Me., 394 A.2d 276, 279 (1978).

tain a declaratory judgment (1) that the vote taken pursuant to section 9 of P.L. 1979, ch. 452 was invalid, with the result that the new tax never became effective, and (2) that section 9 of chapter 452 was constitutionally invalid on its face as a surrender by the Legislature of its taxing power in violation of article IX, § 9 of the Maine Constitution. The complaint sought an injunction against further collection of the tax and an order to return all sums exacted from plaintiffs under the statute.

The Superior Court found that the balloting process employed to carry out the provisions of P.L. 1979, ch. 452, § 9 was so egregiously defective as to be invalid; that no remedy by way of recount or appeal under the Election Law (21 M.R.S.A. ch. 27, subch. 3) had been available to plaintiffs because the balloting was not an "election" or "referendum" within the meaning of the Election Law; and that the statute entailed a surrender of the taxing power of the Legislature in violation of article IX, § 9 of the Maine Constitution. On the other hand, because of the equitable nature of the action, the court concluded that it could appropriately consider, in framing a remedy, plaintiffs' delay in bringing the action. The court therefore declared the tax purportedly established under P.L. 1979, ch. 452 to be null and void, and the tax established by old section 4505 of title 36, as enacted by P.L. 1969, ch. 213, section 1 (five cents per hundredweight) to be still in effect. The judgment further ordered, among other things, that defendants be enjoined from collecting any tax under section 4505 in excess of five cents per hundredweight until such time as the statute might be amended or until further order of court; that the defendant state treasurer refund to the individual plaintiff and to the members of the corporate plaintiff all taxes collected under section 4505 in excess of five cents per hundredweight since March 20, 1981, the date of commencement of this action.

The plaintiffs' complaint does not explicitly aver the procedural basis on which it is brought. It makes no reference to M.R.Civ.P. 80B or the Administrative Procedure Act, 5 M.R.S.A. ch. 375 (1979 & Supp. 1981–82), providing the usual procedure for challenging administrative actions. It requests declaratory and injunctive relief, however, and at oral argument counsel for plaintiffs stated that the action had been brought under the Declaratory Judgments Act, 14 M.R.S.A. ch. 707 (1980 & Supp. 1981–82). The defendants have never filed an answer to the complaint or moved to dismiss it, perhaps relying tacitly on provisions of Rule 80B(a) and section 11005 of the Administrative Procedure Act to the effect that an answer is not ordinarily required, except by order of court, where relief is sought by means of either of those procedures. Plaintiffs could not, of course, by-pass any applicable procedures required by Rule 80B or the Administrative Procedure Act. Nevertheless, insofar as they sought a judgment declaring that section 9 of P.L. 1979, ch. 452 is unconstitutional and injunctive relief based on such a declaration, they were not confined to relief under M.R.Civ.P. 80B or the Administrative Procedure Act.[7] However, the case presents questions, not addressed in the Superior Court or in the briefs of counsel, whether plaintiffs' attack based on defects in the voting procedure as it was carried out required resort to the judicial review provisions of the Administrative Procedure Act, 5 M.R.S.A. ch. 375, subch. 7 (1979 & Supp. 1981–82), and, if so, whether the defendants were required to set up affirmatively any appropriate time bar provided in 5 M.R.S.A.

---

7. See *Poe v. Mayor of Baltimore*, 241 Md. 303, 216 A.2d 707 (1966); *Verkouteren v. Supervisor of Assessments*, 38 Md.App. 216, 380 A.2d 642 (1977); *Lutheran Church v. City of New York*, 27 A.D.2d 237, 278 N.Y.S.2d 1 (1967). The principle has been stated, as follows, in *Pressman v. State Tax Comm'n*, 204 Md. 78, 84, 102 A.2d 821, 825 (1954):

[W]here a statute provides a special form of remedy, the plaintiff must use such form rather than any other, but constitutional issues may be decided in an action for a declaratory judgment or decree or injunction if there is no by-passing of an administrative agency in a case calling for determination of facts within the sphere of the agency's expertise.

§ 11002(3) (1979) in order to defend on the ground of untimeliness. In view of our decision that the Superior Court was clearly correct in holding P.L. 1979, ch. 452, § 9 unconstitutional on its face, we find it unnecessary to address the difficult questions related to the plaintiffs' choice of remedy for the defects in the procedure for obtaining the producers' vote required by the statute as a condition precedent to its effectiveness. The Declaratory Judgments Act afforded a proper procedure for reaching the ultimate judgment arrived at by the Superior Court.

Even if we were to address the issue of the validity of the voting procedure, it would still be necessary to reach the constitutional issue. If we were to uphold the decision of the Superior Court that the voting procedure itself had been so defective as to be invalid, we would have to confront the question of an appropriate plaintiffs' remedy. It would not be correct, for example, in a case where the constitutionality of the statute has been appropriately challenged, to require that a new producers' vote be held without addressing the constitutional issue. On the other hand, if the defects in the voting procedure were not sufficient to render it invalid, the plaintiffs' challenge to the use of a producer vote to establish the tax would remain for resolution. It is therefore necessary that the constitutional issue be decided here. *See Osier v. Osier*, Me., 410 A.2d 1027, 1029 (1980); *State v. Good*, Me., 308 A.2d 576, 579 (1973).

The defendants have appealed on various grounds, discussed below. The three petitioners to intervene in the Superior Court have also filed an appeal, contending for the first time on appeal that the milk tax is only an assessment of an industry group for that group's own benefit and purposes, with the result that legislative surrender of the taxing power is not in issue. The attorney general, representing the defendant state tax assessor and state treasurer, rejects the analysis of the petitioners to intervene. The plaintiffs cross-appeal, contending that the trial justice erred in not awarding damages measured by all their overpayments of the tax rather than by their overpayments

made only after the beginning of suit. Although we do not find it necessary to pass upon the correctness of all the findings of the Superior Court, we find no error in the judgment itself and affirm it.

### I. *Validity of the Producers' Vote*

Defendants argue that (1) the producers' balloting was not so defectively administered as to be invalid; (2) whether the balloting was valid was not an issue the Superior Court had jurisdiction to decide because the vote was a "referendum" subject to the Election Law, which provides its own non-judicial remedies, 21 M.R.S.A. ch. 27, subch. 3, and ch. 36 (Supp. 1981–82); and (3) if not within the scope of the Election Law, the producer balloting was subject to the common law of public elections, under which the courts have limited remedial powers.

On the assumption *arguendo* that those issues are properly before this Court, it is unnecessary for us to decide them in view of our conclusion that P.L. 1979, ch. 452, § 9 is clearly invalid under article IX, section 9 of the Maine Constitution. We do not address those issues.

### II. *Constitutionality of the Statute*

Article IX, section 9 of the Maine Constitution provides as follows:

The Legislature shall never, in any manner, suspend or surrender the power of taxation.

The chief issue on appeal is whether that provision prohibited the Legislature from making the new milk tax effective only if the producers, who are required ultimately to bear the burden of the tax, approved it by majority vote. The plaintiffs contend that it did. The defendants argue that chapter 452 is just an example of contingent legislation, in which the Legislature makes the effective date of an enactment dependent on some external event. Such a provision would not ordinarily raise a constitutional issue.

The exaction from milk dealers provided by 36 M.R.S.A. § 4505, which they may recoup from milk producers under 36 M.R.S.A. § 4506, has, to say the least, several

characteristics of a tax. It is referred to as a "tax" in the statute, and the proceeds of the exaction are collected by the state tax assessor, 36 M.R.S.A. § 4507, and are received by the state treasurer, 36 M.R.S.A. § 4511. There are penalties and enforcement provisions in the event of non-payment. 36 M.R.S.A. § 4512. The exaction is imposed to raise revenue for promotional, educational, advertising and research programs of the Maine dairy industry—activity which, according to the statute, will promote the prosperity and welfare of the state. 36 M.R.S.A. §§ 4501, 4511.

The exaction in question is not a license fee, required as a condition of doing business and imposed as a feature of a program, sustainable under the state's police power, for regulation of a particular business, occupation or profession. Cf. Board of Overseers of the Bar v. Freddie F. Lee, Me., 422 A.2d 998 (1980) (upholding Maine Bar Rule 10 against a constitutional challenge).[8] The fact that revenue from the exaction is dedicated to promotion of the dairy industry does not of itself prevent the exaction from being characterized and treated as a tax. The finding in 36 M.R.S.A. § 4501 that the milk tax law will "promote the prosperity and welfare" of the state, as well as of the Maine dairy industry, is entitled to great deference by the courts. This Court held a similar exaction (since repealed) on quahogs to be an exaction imposed for a public purpose and hence a tax within the Legislature's constitutional taxing power. State v. Lasky, 156 Me. 419, 165 A.2d 579 (1960). The milk tax closely resembles the former quahog tax in the nature of its purpose in that it is "expressly designed to be of financial benefit to the industry, and hence to the state." State v. Lasky, supra at 427, 165 A.2d at 583.

The plaintiffs do not question the constitutional power of the Maine Legislature to impose such an exaction. Our decision therefore addresses only the question whether the requirement of an affirmative vote by a majority of certified milk producers before the tax can take effect was a surrender of the power to tax that was impermissible under the Maine Constitution.

■ In Morris v. Goss, 147 Me. 89, 83 A.2d 556 (1951), we said: "It is for the Legislature to decide, within constitutional limitations, what form or forms of taxation are or may be necessary for the essential needs of the State. Except possibly as limited by the provision in the Constitution for initiated legislation, this question is exclusively within the legislative province." Id. at 107–08, 83 A.2d at 566. In exercising the power to tax, the Legislature must complete two steps: "first, a determination of the nature of the tax to be imposed; and, second, the effective imposition of the tax in such a manner as to insure its collection and availability to the State for the purposes for which it is raised." Morris v. Goss, supra at 103, 83 A.2d at 564. In effect, the provisions of P.L. 1979, ch. 452, § 9 gave to certified Maine milk producers, or a majority of them, the power to decide which of two forms of tax on milk dealers would be in effect after January 1, 1980 or, in other words, whether the new tax would be collected. Although the Legislature defined the two alternative forms of the tax, it was the vote of the producers, not the vote of the Legislature, that constituted the final act in the determination of the form and amount of the tax.

---

8. Maine Bar Rule 10 requires payment of an annual fee by all attorneys who practice law in Maine. The proceeds are used to support the disciplinary procedures of the Board of Overseers of the Bar. We held in Freddie F. Lee that Maine Bar Rule 10 is not a bill for imposing a tax or for raising a revenue, saying:

A tax . . . is a charge either to raise money for public purposes or to accomplish some governmental end. When the exactions, however, are not imposed for the main purpose of revenue, but are imposed in the exercise of a police power and as part of a program for the regulation of a particular business, occupation or profession, the levies are license fees and not taxes.

Id. at 1004. The fee challenged in Freddie Lee was imposed by rule of the Supreme Judicial Court as part of the Court's inherent disciplinary power. The statute challenged in the instant case was enacted by the Legislature, which is subject to an express constitutional provision forbidding it to surrender the power of taxation.

The defendants contend that the referendum required by chapter 452 merely makes the effective date of the tax, already determined by the Legislature, contingent upon producers' approval, citing among other cases two in which the United States Supreme Court upheld against constitutional attack contingent legislation delegating regulatory power dependent on the action of private groups. *United States v. Rock Royal Cooperative, Inc.*, 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); *Currin v. Wallace*, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441 (1939). Those cases involved, among other things, application of the due process clause of the 14th amendment to certain delegations of regulatory power. They are not persuasive here, let alone controlling, where the issue is the meaning of a state constitutional prohibition against surrender in any manner of the Legislature's power of taxation.

The defendants argue that the case is essentially the same as one in which the effectiveness of the statute is made to depend on the occurrence of some event. We may suppose for the sake of argument that a contingent taxing statute would be valid if the contingency on which it was to go into effect were an event having significance independent of a decision by potential tax payers of the question whether to make the statute effective by voting for the tax. The case would be different, for example, if the tax were to go into effect only if the Legislature were to enact some other measure. Here, however, the form of the tax was to be ultimately determined by a group other than the Legislature, and a vote for the new tax by a majority of that group became the very act that made the contingent statute effective.

The contingency contemplated by section 9 of P.L. 1979, ch. 452 was not an event having independent significance. The statute differs in that crucial respect from legislation of the kind upheld by the Supreme Court in *United States v. Rock Royal Coop-*

*erative, Inc., supra*, and *Currin v. Wallace, supra*.

■ The petitioners to intervene have advanced the argument, rejected by the state tax assessor and treasurer, that the milk tax is not a tax at all but an assessment of an industry group for the industry's own benefit and thus outside any constitutional limitation on relinquishment of the taxing power by the Legislature. Although we would ordinarily consider an argument not presented to the trial court to be unavailable on appeal as a basis for finding error in the trial court's decision,[9] we cannot properly disregard it in reviewing a determination that particular legislation is unconstitutional. Such a determination is a most serious exercise of judicial responsibility and should be made only after every consideration that might result in upholding the legislation is taken into account.

The proposition that the exaction known as the milk tax is really an assessment that a group engaged in a particular industry was authorized to make for the benefit of that industry is based on the argument that, in effect, P.L. 1979, ch. 452, § 9 afforded an option to producers whether to be assessed at the old or new rate, and that the tax power of the Legislature was not thereby drawn into question. The contention is based on cases from other jurisdictions where courts have considered elaborate systems, authorized by state legislation, for regulating the marketing of agricultural produce. Under such statutes, the producers of a commodity may adopt a marketing program by referendum and thereby subject themselves to systematic assessment at rates set within statutory limits. The Michigan and New York marketing programs are described, at least in their legal aspects, in *Dukesherer Farms, Inc. v. Ball*, 405 Mich. 1, 273 N.W.2d 877 (1979), and *Wickham v. Trapani*, 26 A.D.2d 216, 272 N.Y.S.2d 6 (1966). The assessment proceeds in those cases were expressly characterized as not being "state funds," did not go into the

9. "A party who seeks to raise an issue for the first time at the appellate level is held to have waived that issue insofar as he utilizes it to attack the judgment or order from which he appeals." *Laurel Bank & Trust Co. v. Burns*, Me., 398 A.2d 41, 44 (1979).

public treasury, were determined within statutory limits by the producers in a particular marketing program, and were collected by the committee in charge of that program. Under that type of statute, the proceeds are used for operating the marketing program for the commodity.

■ There are critical differences between the legislation involved in the present case and the arrangements authorized by the marketing program statutes of other states. Perhaps the most significant is that under a marketing program, the producers of a commodity make the basic decision whether to be assessed at all when they vote on whether to enter a marketing program for that commodity. Maine milk producers *must* pay the exaction imposed by the Legislature in 36 M.R.S.A. § 4505. Their only choice under P.L. 1979, ch. 452 was, in effect, whether to pay at the old rate or the new. Also, under the marketing programs of other states, provision is sometimes made for refund to producers at the close of the marketing season. There is no such provision in the Maine Milk Tax Law. Indeed, the only similarity lies in the fact that a producer who does not want to join a marketing program and pay an assessment may be legally bound nonetheless by the vote of his fellow producers. In view of important differences, this one similarity is not sufficient to justify characterizing the exaction under 36 M.R.S.A. § 4505 as an "assessment."

We hold, therefore, that the milk tax, so called, is indeed a tax and that it is imposed by the Legislature's exercise of its constitutional taxing power. It is not a license fee, and it is not an assessment. The only question is whether in section 9 of P.L. 1979, ch. 452 the Legislature "surrendered" its power of taxation by letting the producers by majority vote determine the form of the tax as ultimately imposed.

The broadly inclusive language of article IX, section 9 of the Maine Constitution plainly appears to forbid the Legislature from thus surrendering to the certified Maine milk producers the final decision on the form and amount of the tax to which Maine dealers will be subject. The question arises, Is there any reason to suppose that the constitutional language was not intended to have so inclusive an effect?

The original purpose of article IX, section 9 of the Maine Constitution, which was adopted by the people of Maine to become effective January 5, 1876, was to curb a legislative practice of including in charters of railroads and canal companies clauses purporting to create certain permanent immunities from taxation.[10] *See* Address of Gov. Connor to Maine Legislature, Jan. 6, 1876, *reported in* 1876 Me. Acts & Resolves 145, 149. *See also Railroad Co. v. Maine,* 96 U.S. 499, 24 L.Ed. 836 (1877). Closely similar constitutional provisions were adopted by several states, the Maine version being unusual by including the words "in any manner" in the prohibition.

It has been suggested that the constitutional prohibition should be construed in the light of its original purpose as limited to legislation purporting to create perpetual immunities or exemptions from taxation. If the provision could be properly regarded as so limited, the arrangement sought to be enacted by section 9 of P.L. 1979, ch. 452, would not come within the prohibition. Yet the language of the prohibition is broad enough to include a surrender or suspension of the taxing power having some effect other than creation of a permanent tax immunity. The words "never" and "in any manner" create a strong and sweeping prohibition. Nothing in the history of the constitutional provision would support a conclusion that to give it effect in the instant case would be absurd, unjust or undesirable, even though its application here does not appear to further the original, more limited purpose for which the provision was adopted in 1876. We can find no justification for importing such a limitation into the clear prohibition of article IX, section 9 of the

10. For examples of such charters, *see* Me.Priv. & Spec.L., 1845, ch. 270, "An Act to establish the Androscoggin and Kennebec Rail Road;" *id.,* ch. 285, "An Act to establish the Penobscot and Kennebec Rail Road."

Maine Constitution. It does not seem inappropriate to apply the prohibition to invalidate a statute purporting to give one group of citizens the power to increase another group's taxes even where the group having that power must ultimately bear the resulting burden.

█ Although P.L. 1979, ch. 452, § 3 set a rate of tax to be imposed, that rate could not come into effect without the favorable vote of a majority of certified producers. The determination of what money shall be raised by taxation, a question that rests exclusively with the Legislature under the Maine Constitution, *Greaves v. Houlton Water Co.*, 143 Me. 207, 211, 59 A.2d 217, 220 (1948), was surrendered, in effect, to the certified producers of Maine milk in section 9 of chapter 452. That the Maine Legislature may not do. We decide, therefore, that the trial justice was correct in holding that by enacting section 9 of P.L. 1979, ch. 452, the Legislature unconstitutionally surrendered its power of taxation.

### III. *The Remedy*

The trial court's remedy was to enjoin collection of the tax at a rate in excess of that provided in old section 4505 (five cents per hundredweight) and to order refund of all milk taxes collected in excess of five cents per hundredweight after the date of commencement of plaintiffs' action. The refund order in the trial court's judgment was the result of a tacit choice by that court among two or three possible ways of carrying out its decision that the Legislature could not constitutionally condition the effectiveness of P.L. 1979, ch. 452 on approval of the new form of tax by vote of the producers. Conceivably the unconstitutional condition could have been treated as totally inoperable with the result that the new tax would have come into effect unconditionally. Such a ruling would have disregarded the apparently predominant intent of the Legislature that the new tax not go into effect without approval of the producers. The decision the trial justice actually reached is correct in giving full force to

that predominant intent, but her choice of remedy tacitly resolved a difficulty that needs to be confronted explicitly.

The first sentence of section 9 of P.L. 1979, ch. 452 provides, "This Act shall not take effect unless . . . ." [11] If that sentence were interpreted literally, the whole act would be rendered ineffective, not merely the provisions of section 3 repealing and replacing section 4505 of title 36, since the Legislature could not constitutionally condition the effectiveness of the new tax on a favorable producers' vote. The new definitions provided by section 1 of chapter 452, the establishment and composition of the Maine Dairy Promotion Board provided by section 2, the substitution of "dealers" for "handlers" throughout the entire milk tax law, and all the repealer provisions contained in chapter 452 would be rendered inoperative.

It is obvious that the Legislature did not intend those consequences to follow in the event of a refusal by producers to approve the new form of tax in their vote under section 9, and those consequences should not be deemed to follow from our decision that the new tax did not go into effect because the Legislature unconstitutionally surrendered its power to tax when it enacted section 9. The sensible construction of section 9 of P.L. 1979, ch. 452 is that it set a condition on the effectiveness of only section 3 of chapter 452, providing for the new form of tax, and did not apply to the other provisions of the act. This construction resolves all anomalies, including the bizarre provision that the act was not to become effective unless the described balloting procedure were followed commencing within 30 days after the effective date of the act.

█ Adopting this construction of the first sentence of section 9 of the statute, we decide that the remedial provision of the Superior Court's judgment was correct. The milk tax of five cents per hundredweight imposed by 36 M.R.S.A. § 4505 as amended by P.L. 1969, ch. 213, § 1, is still in effect and is the proper basis for determin-

---

11. See text of the act, *supra* n. 4.

█

ing plaintiffs' recovery. *See* 1 M.R.S.A. § 71(8) (1979); *Lambert v. Wentworth,* Me., 423 A.2d 527 (1980). Moreover, there was no error in limiting the plaintiffs' pecuniary recovery to a refund calculated from the time they commenced their suit rather than from the supposed effective date of the new tax. In an action equitable in nature, the trial court has wide discretion to arrive at a limitation of relief by balancing all the factors involved. As far as appears from the record, the state spent the proceeds of the tax for purposes contemplated by the milk tax law in good faith reliance on the validity of the new tax. The trial court did not abuse its discretion in deciding not to permit reimbursement of the plaintiffs for money they had paid to dealers without protest for fourteen months before bringing this action.

The entry is:

Judgment affirmed.

All concurring.