**OPINION OF THE JUSTICES OF THE SUPREME JUDICIAL COURT Given Under the Provisions of Section 3 of Article VI of the Constitution.**

Supreme Judicial Court of Maine.

Questions Propounded to the Justices in an Order Dated June 12, 1991.

Answered June 20, 1991.

## SENATE ORDER PROPOUNDING QUESTIONS TO THE JUSTICES OF THE SUPREME JUDICIAL COURT

WHEREAS, it appears to the Senate of the 115th Legislature that the following are important questions of law and that this is a solemn occasion; and

WHEREAS, the Constitution of Maine, Article VI, Section 3 provides for the Justices of the Supreme Judicial Court to render their opinion on these questions; and

WHEREAS, there is now before the Senate for its final enactment Committee Amendment "A" to House Paper 598, Legislative Document 849, "An Act to Stabilize the Maine Dairy Industry" and the constitutionality of that Act has been questioned; and

WHEREAS, the Act establishes an excise tax on the handling in this State of packaged milk for retail sale in this State; and

WHEREAS, that excise tax would be payable by milk dealers at the wholesale level for milk packaged in this State for retail sale in this State and would be payable by milk retailers at the retail level for milk packaged outside this State and imported into this State for retail sale in this State; and

WHEREAS, the overwhelming majority of milk purchased by consumers in this State is produced and packaged in this State; and

WHEREAS, if persons subject to the excise tax established by the Act or persons who package milk outside the State for retail sale in the State challenge or do not pay the excise tax, there is a substantial likelihood of severe disruption in milk markets in this State that could pose a serious threat to the continued viability of the dairy industry in this State; now, therefore, be it

ORDERED, that in accordance with the provisions of the Constitution of Maine, the Senate respectfully requests the Justices of the Supreme Judicial Court to give the Senate their opinions on the following questions of law:

Question No. 1. If the provisions of Legislative Document 849, as amended by Committee Amendment "A," become law, would they violate the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3?

Question No. 2. If the provisions of Legislative Document 849, as amended by Committee Amendment "A," become law, would they violate the Public Purpose Clause of the Constitution of Maine, Article IV, Part Third, Section 1?

### EXHIBIT A

### STATE OF MAINE

—

### IN THE YEAR OF OUR LORD NINETEEN HUNDRED AND NINETY-ONE

—

### H.P. 598—L.D. 849

### An Act to Stabilize the Maine Dairy Industry

**Emergency preamble. Whereas,** Acts of the Legislature do not become effective until 90 days after adjournment unless enacted as emergencies; and

**Whereas,** the producer price of milk has dropped approximately 40% as a result of a milk surplusage west of the Mississippi River; and

**Whereas,** the magnitude of these price fluctuations jeopardizes the economic viability and stability of the Maine dairy in-

dustry and Maine agriculture as a whole; and

**Whereas,** the Maine dairy industry is essential to the viability of the State's rural communities and contributes to the general welfare of the State by generating business activity and employment and preserving open space and other benefits for the people of Maine; and

**Whereas,** helping to stabilize the Maine dairy industry during temporary periods of price fluctuations constitutes a public purpose and an appropriate expenditure of tax revenues; and

**Whereas,** in the judgment of the Legislature, these facts create an emergency within the meaning of the Constitution of Maine and require the following legislation as immediately necessary for the preservation of the public peace, health and safety; now, therefore,

**Be it enacted by the People of the State of Maine as follows:**

**Sec. 1.** 7 MRSA § 2954, sub-§ 1 as repealed and replaced by PL 1987, c. 447, § 1, is amended to read:

**1. Commission empowered to establish prices; public hearing.** The commission is vested with the power to establish and change, after investigation and public hearing, the minimum wholesale and retail prices to be paid to producers, dealers and stores for milk received, purchased, stored, manufactured, processed, distributed or otherwise handled within the State. The commission shall hold a public hearing prior to the establishing or changing of such minimum prices. The commission may proceed, however, under the emergency rulemaking provisions of Title 5, section 8054 without making findings of emergency when the only changes to be made in the minimum prices are to conform with the orders of any federal or other agency duly authorized by law to establish or negotiate producer prices or are to respond to other conditions affecting prevailing Class I and, Class II and Class III prices in southern New England, or reflect the Maine Dairy Farm Stabilization Tax as determined by Title 36, chapter 708-A. Title 5, section 8054, subsection 3, the second sentence, does not apply to minimum prices adopted under the previous sentence. Due notice of the public hearing shall must be given by publishing notice as provided in Title 5, chapter 375. The commission shall hold such a public hearing not less frequently than once every 12 months to determine whether the minimum wholesale and retail prices then established should be changed. In addition to the data received through the implementation of the information gathering procedures of its rules as a basis for its determinations, the commission shall solicit and seek to receive oral and written testimony at hearings to determine whether the minimum wholesale and retail prices then established should be changed and whether the proposed minimum wholesale and retail prices are just and reasonable.

**Sec. 2.** 7 MRSA § 2954, sub-§ 2, ¶ B, as repealed and replaced by PL 1975, c. 517, § 3, is amended to read:

B. The minimum wholesale prices paid to dealers shall must be established to reflect the lowest prices at which milk purchased from Maine producers in this State at Maine minimum prices in the State can be received, processed, packaged and distributed within the State of Maine at a just and reasonable return, and in addition must include the amount of any tax determined by Title 36, chapter 708-A.

**Sec. 3.** 7 MRSA § 2954, sub-§§ 13 and 14 are enacted to read:

**13. Report to State Tax Assessor.** The Maine Milk Commission shall report before the first of each month to the State Tax Assessor the basic price of milk established for that month as defined in Title 36, chapter 708-A.

**14. Effective date of certain prices; repeal.** Any new minimum wholesale prices paid to dealers and new minimum retail prices established pursuant to this section are effective on the first Sunday of the calendar month. This subsection is repealed on November 7, 1993.

**Sec. 4.** 36 MRSA c. 708-A is enacted to read:

## CHAPTER 708-A

## MAINE DAIRY FARM STABILIZATION ACT

### § 4541. Short title

This chapter may be known and cited as the "Maine Dairy Farm Stabilization Act."

### § 4542. Definitions

As used in this chapter, unless the context otherwise indicates, the following terms have the following meanings.

**1. Basic price.** "Basic price" means the minimum Class I price of milk established pursuant to Title 7, chapter 603 including that part of the Class I price that exceeds the applicable Class I price established pursuant to the New England Milk Marketing Order, except such part of the Class I price established by the Maine Milk Commission to reflect the cost factors provided in Title 7, section 2954, subsection 2 or the increased costs of production pursuant to Title 7, section 2954, subsection 2, paragraph A.

**2. Handler.** "Handler," with respect to a particular container of packaged milk, means the wholesale handler or, if none, the retail handler.

**3. Milk.** "Milk" has the same meaning as in Title 7, section 2951, subsection 6.

**4. Packaged milk.** "Packaged milk" means milk that has been processed and placed in containers for ultimate sale to consumers.

**5. Person.** "Person" means any individual, partnership, firm, corporation, association or other unit and the State and all political subdivisions or agencies of the State.

**6. Retail handler.** "Retail handler" means any person who handles packaged milk in this State that is next sold in this State subject to the retail minimum prices established pursuant to Title 7, chapter 603.

**7. Tax period.** "Tax period" means the period beginning the first Sunday of the calendar month and continuing through the Saturday prior to the first Sunday of the following calendar month.

**8. Wholesale handler.** "Wholesale handler" means any person who handles packaged milk in this State that is next sold in this State subject to the minimum wholesale prices paid to dealers established pursuant to Title 7, chapter 603.

### § 4543. Maine Dairy Farm Stabilization Tax

**1. Tax.** An excise tax is levied and imposed at the rate established in subsection 2 on the handling in this State of packaged milk for sale in this State. With respect to the handling in this State of a particular container of packaged milk for sale in this State, the tax must be paid by the wholesale handler or, if there is no wholesale handler with respect to that container of packaged milk, by the retail handler. There is no tax on the handling in this State of packaged milk for sale that never becomes subject to minimum retail prices that have been established pursuant to Title 7, chapter 603.

**2. Rate.** The rate of the tax levied under this chapter is established for each tax period on the basis of the basic price of milk in effect on the first day of the tax period in accordance with the following chart:

| Basic Price | Rate of Maine Dairy Farm Stabilization Tax |
|---|---|
| $16.00 per hundredweight and above | 0¢ per quart |
| $15.50 to $15.99 per hundredweight | 1¢ per quart |
| $15.00 to $15.49 per hundredweight | 2¢ per quart |
| $14.50 to $14.99 per hundredweight | 3¢ per quart |
| $14.00 to $14.49 per hundredweight | 4¢ per quart |
| below $14.00 per hundredweight | 5¢ per quart |

For any container other than a quart, the tax is computed on a quart equivalent basis.

**3. Calculation of tax.** Handlers shall pay the tax for each tax period on all milk subject to the tax, sold during the tax period, and either:

A. Subject to the minimum wholesale prices paid to dealers established by the Maine Milk Commission pursuant to Title 7, chapter 603; or

B. Not subject to minimum wholesale prices paid to dealers but subject to minimum retail prices established by the Maine Milk Commission pursuant to Title 7, chapter 603.

In calculating the amount of packaged milk handled for sale in this State each tax period, the handler shall deduct any packaged milk returned to the handler during that tax period.

**4. Report.** By February 15th of each year, the Commissioner of Agriculture, Food and Rural Resources shall submit a report to the joint standing committee of the Legislature having jurisdiction over agricultural matters describing the total amount of tax collected and distributed under this chapter during the 12 preceding tax periods, the prices for milk then prevailing on the Maine and Boston markets, the supply and demand for milk in this State and New England and the present condition and future prospects of the State's dairy industry. The commissioner shall include recommendations, if any, concerning changes in the rates of the Maine Dairy Farm Stabilization Tax.

**5. Tax as additional.** Any tax imposed and collected under this chapter is in addition to any other taxes imposed or collected under any other law of the State.

**6. Records, reports and administration.** Every handler subject to the tax imposed under subsection 1 shall register with the State Tax Assessor within 5 business days of becoming subject to the tax and annually thereafter on forms provided by the State Tax Assessor. The list of handlers so registered is available to the public. By the 25th day of each calendar month, every handler subject to the tax imposed under subsection 1 shall report to the State Tax Assessor the quantity of packaged milk handled in this State for sale in this State during the preceding tax period, the quantity of packaged milk handled that was subject to the Maine Dairy Farm Stabilization Tax and any other information the State Tax Assessor determines necessary or useful in the administration of this chapter and enforcement of the Maine Dairy Farm Stabilization Tax.

**7. Due dates.** Handlers shall pay to the State Tax Assessor the tax due for the preceding tax period not later than the 25th day of each calendar month and submit any information required by the State Tax Assessor on the forms provided.

**8. Presumption.** In any proceeding against a retail handler for collection of the tax with respect to any particular container of packaged milk, there is a rebuttable presumption that that retail handler did not purchase that container in a transaction subject to the minimum wholesale prices paid to dealers established pursuant to Title 7, chapter 603. The burden is on the retail handler to show that the retail handler purchased that container of packaged milk in a transaction subject to minimum wholesale prices paid to dealers established pursuant to Title 7, chapter 603.

**§ 4544. Maine Dairy Farm Stabilization Fund**

**1. Fund created.** The State Tax Assessor shall immediately pay all funds received from the Maine Dairy Farm Stabilization Tax to the Treasurer of State. The Treasurer of State shall keep these funds and all other funds appropriated by the Legislature for the purposes of this chapter in a separate account called the Maine Dairy Farm Stabilization Fund. The Treasurer of State shall invest all money credited to the fund in accordance with applicable provisions of law and all earnings must be credited to the fund. The funds must be invested in a manner that ensures that all deposits and earnings are available for withdrawal on a monthly basis without

penalty. Revenue credited to the fund, including interest accrued by investment of the fund, must be used solely for the purposes of this chapter as provided in subsection 2. The funds credited to the fund do not lapse.

2. **Distribution.** All funds collected under this chapter and all other funds appropriated by the Legislature for the purposes of this chapter and interest earnings on these funds must be distributed by the Treasurer of State on a monthly basis as follows.

A. Ninety-four percent of the funds collected under this chapter and all other funds appropriated by the Legislature for the purposes of this chapter and any earnings on these funds must be paid each month to the Commissioner of Agriculture, Food and Rural Resources for distribution to Maine market producers and Boston market producers equally per hundredweight on the basis of their production during the prior month. Such payments to producers must be made by the 20th day of the month following the month that payment of the tax is due. A payment may not be allocated to that portion of a producer's milk production that is in excess of 400,000 pounds per month. Notwithstanding any other provisions of law, the funds distributed to producers under this paragraph are allotted for the purposes of this paragraph and the Commissioner of Agriculture, Food and Rural Resources or the Maine Milk Pool administrator pursuant to Title 7, section 3154, as the commissioner's designee, is authorized to prepare and sign warrants for the payment of the amounts due to producers from the Maine Dairy Farm Stabilization Fund under this chapter.

B. Four percent of the funds collected each month must be paid into a separate, nonlapsing account to be allocated by the Legislature on an annual basis to supplement the Women, Infants and Children Special Supplemental Food Program of the United States Child Nutrition Act of 1966 administered by the Department of Human Services.

C. Two percent of the fund must be paid into a separate, nonlapsing account to be allocated by the Legislature on an annual basis to cover the actual costs of the administration and enforcement of this chapter by the Treasurer of State, the State Tax Assessor, the Attorney General and the Commissioner of Agriculture, Food and Rural Resources. Any remaining balance of this account after these allocations must be redeposited in the Maine Dairy Farm Stabilization Fund for distribution to producers.

**§ 4545. Penalties**

Notwithstanding section 187, any person who fails to file a return required under this chapter, files a return that is materially incorrect or fails to pay the tax due under this chapter is liable for a penalty not to exceed $25,000 or 25% of the tax due, whichever is greater. This penalty is applied separately for each month that the person fails to file a return required under this chapter, files a return under this chapter that is materially incorrect or fails to pay the tax due under this chapter. In any action to enforce this chapter, the person liable for the payment of the tax shall in addition pay all costs of enforcement, including attorney's fees.

**§ 4546. Nonseverability**

If a court of competent jurisdiction in a final judgment not subject to appeal determines that any handler handling packaged milk in this State for sale in this State is not subject to the Maine Dairy Farm Stabilization Tax, then the Maine Dairy Farm Stabilization Tax does not apply to the handling of packaged milk in this State for sale in this State by any other handler and all handlers are relieved of all obligations under this chapter.

**§ 4547. Repeal**

This chapter is repealed on November 7, 1993.

**Sec. 5. Allocation.** The following funds are allocated from the Maine Dairy

Farm Stabilization Fund to carry out the purposes of this Act.

| | 1991–92 | 1992–93 |
|---|---|---|

**AGRICULTURE, FOOD AND RURAL RESOURCES, DEPARTMENT OF**

**Maine Dairy Farm Stabilization Fund**

| | 1991–92 | 1992–93 |
|---|---|---|
| All Other | $4,136,000 | $4,512,000 |

Provides funds for distribution to Maine market producers and Boston market producers on the basis of production.

**Maine Dairy Farm Stabilization—Administration**

| | | |
|---|---|---|
| All Other | $72,707 | $90,482 |

Provides funds for the administration and enforcement of the Maine Dairy Farm Stabilization Act.

**DEPARTMENT OF AGRICULTURE, FOOD AND RURAL RESOURCES**

| TOTAL | $4,208,707 | $4,602,482 |
|---|---|---|

**FINANCE, DEPARTMENT OF**

**Bureau of Taxation**

| | | |
|---|---|---|
| Personal Services | $2,700 | $2,835 |
| All Other | 4,513 | 2,683 |
| Capital Expenditures | 8,080 | |

Provides funds for 4 Tax Examiner positions for 5 weeks per year and general operating expenses to track revenue, contact taxpayers and perform follow-up assistance.

**DEPARTMENT OF FINANCE**

| TOTAL | $15,293 | $5,518 |
|---|---|---|

**HUMAN SERVICES, DEPARTMENT OF**

**Bureau of Health**

| | | |
|---|---|---|
| All Other | $176,000 | $192,000 |

Provides funds for the Women, Infants and Children Special Supplemental Food Program.

**DEPARTMENT OF HUMAN SERVICES**

| TOTAL | $176,00 | $192,00 |
|---|---|---|

| **TOTAL ALLOCATIONS** | $4,400,000 | $4,800,000 |
|---|---|---|

**Emergency clause.** In view of the emergency cited in the preamble, this Act takes effect on August 1, 1991.

## ANSWERS OF THE JUSTICES

To the Honorable Senate of the State of Maine:

In compliance with the provisions of section 3 of article VI of the Constitution of Maine, we, the undersigned Justices of the Supreme Judicial Court, have the honor to submit the following answers to the questions propounded on June 12, 1991.

We have no doubt that, within the meaning of the constitutional authorization of advisory opinions,[1] the questions of law now propounded by the Senate are important and arise upon a solemn occasion. As a result, we recognize a constitutional obligation to give our advisory opinions on the Senate's questions. The questions concern the constitutionality of emergency legislation that has already been finally enacted in the House of Representatives, has had two favorable readings in the Senate, and now awaits final enactment there. Although the questions come to us late in the current session, sufficient time remains for the Senate to act upon our advisory opinions before it adjourns. *See Opinion of the Justices,* 338 A.2d 802 (Me.1975) (questions regarding proposed Maine Criminal Code answered while bill still in committee), commented on by *Opinion of the Justices,* 355 A.2d 341, 389 (Me.1976). *Cf. Opinion of the Justices,* 123 Me. 573, 576, 121 A. 902, 903 (1923) (questions propounded too close to adjournment for the Legislature to act on Justices' advice). By no means is the Senate's "anticipated need for the advice ... 'tentative, hypothetical and abstract.'" *Opinion of the Justices,* 355 A.2d at 389 (quoting *Opinion of the Justices,* 330 A.2d 912, 915 (Me.1975)). Rather the questions are of "instant, not past or future concern; things of live gravity" to the Senate. *Opinion of the Justices,* 134 Me. 510, 513, 191 A. 487, 488 (1936). We proceed to address the Senate's questions.

QUESTION NO. 1. If the provisions of Legislative Document 849, as amended by Committee Amendment "A," become law, would they violate the Commerce Clause of the United States Constitution, Article I, Section 8, Clause 3?

We answer Question No. 1 in the negative.

■■■ Although phrased in terms of Congress's power to regulate interstate commerce, the Commerce Clause also operates to protect free trade among the States. *See Dennis v. Higgins,* —— U.S. ——, 111 S.Ct. 865, 872, 112 L.Ed.2d 969 (1991). In the exercise of its regulatory and taxing powers, no state may unduly interfere with the free trade of goods and services in the national marketplace. *See Reeves, Inc. v. Stake,* 447 U.S. 429, 436–37, 100 S.Ct. 2271, 2277–78, 65 L.Ed.2d 244 (1980). A State may, however, levy a tax that imposes a burden on those aspects of an industry engaged in interstate commerce in order to insure that the industry bears its fair share of the State's tax burden. *See Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 288–89, 97 S.Ct. 1076, 1083–84, 51 L.Ed.2d 326 (1977). In order to determine whether Committee Amendment "A" will withstand a Commerce Clause challenge, we consider whether the proposed Maine dairy farm stabilization tax

(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State.

*Maryland v. Louisiana,* 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981). *See also Private Truck Council v. Secretary of State,* 503 A.2d 214, 217 (Me.), *cert. denied,* 476 U.S. 1129, 106 S.Ct. 1997, 90 L.Ed.2d 677 (1986).

The first, second, and fourth parts of that four-part test are easily satisfied by Committee Amendment "A." First, the event that is taxed, the handling of milk for retail sale here, has an obvious substantial

---

1. The Maine Constitution, article VI, section 3, reads in full as follows:

    The Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the Governor, Senate or House of Representatives.

nexus with Maine. Second, the tax presents no problems with the fair apportionment requirement; the tax is imposed only on events occurring within Maine and thus no occasion arises for making any apportionment. Finally, the services provided by Maine, including police protection, as well as access to Maine's transportation system, benefit all milk handlers subject to the tax and the tax is fairly related to those benefits, regardless of the source of the milk sold in Maine. The Commerce Clause imposes no requirement that the nature of the services provided by the state have a more specific relationship to the handling of milk in Maine. *See Goldberg v. Sweet,* 488 U.S. 252, 267, 109 S.Ct. 582, 592, 102 L.Ed.2d 607 (1989) ("a taxpayer's receipt of police and fire protection, the use of public roads and mass transit, and the other advantages of civilized society satisfied the requirement that the tax be fairly related to benefits provided by the State to the taxpayer").

■ We find that the tax imposed by Committee Amendment "A", on its face, does not discriminate against interstate commerce by providing direct commercial advantages to the Maine dairy industry. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 268–69, 104 S.Ct. 3049, 3053–54, 82 L.Ed.2d 200 (1984). In the first place, the tax paid by handlers ultimately will be borne by Maine consumers who already pay the same minimum price for in-state and out-of-state milk as a result of price controls. *See* 7 M.R.S.A. § 2953 (1989 & Supp.1990). The tax that is paid by handlers and passed along to consumers will be the same for in-state milk and out-of-state milk: the tax base and the tax rate are equivalent for milk packaged in-state and for milk packaged out-of-state and there are no exemptions from the tax for milk that is produced and intended for sale in Maine. Thus, the tax itself will not produce any difference whatever between the price of in-state milk and out-of-state milk paid by Maine consumers nor will it influence their purchasing decisions. That

the proposed legislation would distribute the funds collected from the tax to Maine's dairy producers, although evincing the Legislature's express intent to aid the Maine dairy industry, presents no grounds for a Commerce Clause challenge. As presently interpreted, the Commerce Clause reaches only a state's power to regulate and to tax, and not its power to spend. *See Reeves, Inc. v. Stake,* 447 U.S. at 437, 100 S.Ct. at 2277. Although Maine may not give its milk producers an advantage in the marketplace by imposing a tax that exacts more from out-of-state participants in the state's economy than from in-state participants or that discourages the purchase of out-of-state milk, it may provide that advantage with a direct subsidy. *See New Energy Co. v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988); *Bacchus Imports, Ltd. v. Dias,* 468 U.S. at 271, 104 S.Ct. at 3055; *see also Reeves, Inc. v. Stake,* 447 U.S. at 441, 100 S.Ct. at 2279 (the Commerce Clause does not prevent a legislature from "fashioning ... effective and creative programs for solving local problems and distributing government largesse").

Committee Amendment "A" requires retail handlers who sell milk packaged outside the state [2] to report on a monthly basis the quantity of milk they have handled; in contrast, the burden of reporting sales of in-state milk falls not on the retail handlers but on the in-state wholesale handlers. We are not able, from the information before us, to determine whether that difference in the reporting requirement will, as applied, discriminate against the sale of milk packaged outside Maine. While the administrative costs of reporting might tend to discourage some retail handlers from selling milk packaged outside Maine, we cannot predict who as a practical matter will ultimately bear the administrative burdens of complying with the reporting requirements, or whether those requirements are in practice any more burdensome than those that already attend the sale of milk at retail in

---

**2.** The Attorney General's brief informs us that about 2% of all milk sold at retail in Maine is

packaged outside the state.

Maine. *See, e.g.,* 7 M.R.S.A. § 2953 (giving the Maine Milk Commission the authority to require from producers, dealers, and stores "accounts of all business transacted which is related to the production, purchasing, processing, sale or distribution of milk"). In sum, we are not convinced that the different reporting requirement for out-of-state milk will have any practical consequence that will be of constitutional dimension.

We conclude that neither facially nor in any practical effect that can reasonably be anticipated does the proposed Maine dairy farm stabilization tax violate the Commerce Clause of the United States Constitution.

QUESTION NO. 2. If the provisions of Legislative Document 849, as amended by Committee Amendment "A," become law, would they violate the Public Purpose Clause of the Constitution of Maine, Article IV, Part Third, Section 1?

■■■ We answer Question No. 2 in the negative. The Legislature has "full power to make and establish all reasonable laws and regulations for the defense and benefit of the people of this State." Me. Const. art IV, pt. 3, § 1. This broad legislative power gives rise to an initial presumption that any statute enacted for the purpose of spending tax revenues is constitutional, and the court will invalidate a statute only in those cases where the Legislature has *clearly* exceeded its constitutional authority by expending tax revenues for other than a "public purpose." *See State v. Stinson Canning Co.,* 161 Me. 320, 323, 211 A.2d 553, 555 (1965). In assessing the constitutionality of a statute, the court undertakes a very narrow inquiry to determine whether the Legislature had a rational basis for its conclusion that the potential benefits to be derived by the public from the enactment of the statute outweigh the detriment to the public occasioned by the burden of additional taxation. *See Common Cause v. State,* 455 A.2d 1, 25–26 (Me.1983). The Legislature may properly conclude that a subsidy to a particular industry will benefit the public by promoting the general economic climate in Maine. *See id.* at 25–26.

In the present case, the Legislature determined that the producer price of milk has fallen sharply as a result of a milk surplus in the western United States, that such temporary price fluctuations create an immediate threat to the survival of a large number of Maine dairy farms that produce and sell less than 400,000 pounds of milk per month, and that the public interest requires a mechanism to provide direct subsidies to stabilize the Maine dairy industry. *See* L.D. 849, Emergency Preamble, § 4544(2)(A) (115th Legis.1991). The Legislature could rationally conclude that the survival of the dairy industry is essential to the preservation of rural communities and open spaces, the maintenance of current employment levels in the dairy industry, and a general promotion of the State's overall economy. As a general rule, excise taxes used to subsidize traditional Maine agricultural and fishing industries are particularly immune from invalidation by the court, since the widespread public benefits of these expenditures can be more readily inferred from the longstanding importance of these enterprises to the State. *See, e.g., State v. Stinson Canning Co.,* 161 Me. at 323, 211 A.2d at 555 (sardine industry); *State v. Lasky,* 156 Me. 419, 426–27, 165 A.2d 579, 583 (1960) (quahog industry); *State v. Vahlsing,* 147 Me. 417, 425, 429, 88 A.2d 144, 148, 150 (1952) (potato industry). *See also Maine Milk Comm'n v. Cumberland Farms,* 160 Me. 366, 379, 205 A.2d 146, 152–53 (1964) (minimum milk price statute upheld).

Given the precise nature of the problem sought to be addressed by Committee Amendment "A," we can find no violation of the public purpose doctrine in the fact that the excise tax revenues will be distributed directly and immediately to a large number of individual dairy producers, rather than indirectly to a general fund used to conduct agricultural research or advertising campaigns that would benefit the dairy industry as a whole. The Legislature could conclude that, unlike Maine wholesalers and retailers of milk, Maine dairy producers will continue to absorb the major economic brunt of these producer price fluctuations. In order to stabilize effectively the

Maine dairy industry, Committee Amendment "A" crafts an excise tax distribution plan that is triggered by a decline in the producer milk price below a rate of $16 per hundredweight, and that is designed to provide a corresponding offset payment to each producer, based on the amount of milk sold by that producer in the previous month. The Legislature would have a rational basis for its conclusion that the direct payment of excise tax revenues to dairy producers is the most efficient method for achieving the public benefits anticipated by the statute. *See* L.D. 849, Emergency Preamble; *see also Common Cause v. State*, 455 A.2d at 25–26 (direct subsidy to BIW upheld). Similarly, there can be little doubt in the present case that the portion of the excise tax revenues allocated by the Committee Amendment "A" to a Department of Human Services program is designed to achieve a valid public health objective.

We conclude that the levy of the Maine dairy farm stabilization tax and the distribution of its proceeds, as proposed by Committee Amendment "A," pass the "public purpose" test of the Maine Constitution.

Dated: June 20, 1991
VINCENT L. McKUSICK,
Chief Justice
DAVID G. ROBERTS,
DANIEL E. WATHEN,
CAROLINE D. GLASSMAN,
ROBERT W. CLIFFORD,
SAMUEL W. COLLINS, Jr.,
MORTON A. BRODY,
Associate Justices

### ADDITIONAL STATEMENT

In my personal opinion, the Maine Constitution (article VI, section 3) places an unqualified obligation on each of us Justices of the Supreme Judicial Court to give his or her opinion on the important questions of law now propounded by the Senate on what is undoubtedly a solemn occasion. *See* n. 1 above. The advisory opinion given today will not be binding when and if the same questions arise in a future litigated case before the Law Court. *See Martin v.*

*Maine Savings Bank,* 154 Me. 259, 269, 147 A.2d 131, 137 (1958). In performance of my constitutional obligation, I herewith give my opinion on the Senate's questions by joining the other Justices in the answers above. At the same time, I inform the Senate of the following circumstance that will probably lead me to recuse myself from any future litigated case raising the same questions: My brother and I own all the stock of a family corporation, Lone Elm Farm, Inc., which owns real estate located in Parkman, Maine, that the corporation leases to a dairy farmer.

VINCENT L. McKUSICK,
Chief Justice.