**CUMBERLAND FARMS, INC., Plaintiff,**

v.

**John LaFAVER, et al., Defendants.**

**Civ. No. 92–70–P–H.**

United States District Court,
D. Maine.

Aug. 3, 1993.

Joel C. Martin, Petruccelli & Martin, Portland, ME, for plaintiff.

Eric Bryant, Asst. Atty. Gen., Augusta, ME, for defendants.

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

HORNBY, District Judge.

Like many states, Maine has found it necessary to take steps to protect its dairy farmers as an embattled species. Usually when states attempt to do this they run afoul of the Interstate Commerce Clause because their legislation discriminates. *See, e.g., Marigold Foods, Inc. v. Redalen,* 809 F.Supp. 714 (D.Minn.1992); *Farmland Dair-*

*ies v. McGuire,* 789 F.Supp. 1243 (S.D.N.Y. 1992); *Baldwin v. G.A.F. Selig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935). Maine has attempted to avoid this pitfall by adopting a slightly different approach from other states. It has applied an "excise tax"[1] uniformly to all packaged milk handled within Maine, regardless of its source. The tax is generated whenever the price of milk falls below a certain level. The proceeds of the tax then go into a special fund and are distributed largely to Maine dairy farmers. I conclude that, under current United States Supreme Court precedents, Maine's scheme passes constitutional muster because the tax is uniformly applied. Although Supreme Court precedents prohibit discriminatory taxes, they do not prevent a state from subsidizing a domestic industry. I conclude that that is what Maine has done here. Economists may consider this a distinction without a difference but, for historical and other reasons, the caselaw recognizes a difference.

## FACTS

All parties have moved for summary judgment on the following undisputed facts. The Maine Dairy Farm Stabilization Act (the "Act"), 36 M.R.S.A. § 4541 et seq., was enacted in 1991, P.L.1991, ch. 526, when the producer price of milk had dropped approximately 40 percent and the number of active dairy farms in Maine had fallen to 659— down from 1023 a decade earlier. Emergency Preamble to the Act, Shaw Aff. ¶ 5. The purpose of the Act was to help stabilize the Maine dairy industry during periods of price fluctuations. Preamble. It tried to do this by creating a stabilization fund to support Maine milk producers,[2] § 4544(1), financed through an "excise tax" on the handling in Maine of packaged milk destined for sale

within Maine and subject to minimum retail prices set by the Maine Milk Commission. § 4543(1).

The tax must be paid by the first handler of packaged milk in the state. *Id.* In most cases that is the wholesale handler (commonly referred to as the dealer); if the milk is packaged out-of-state, then the retail handler in Maine pays the tax. *Id.* The amount of tax is indexed to the "basic price" of milk, § 4543(2), defined as the minimum Class I price of milk as set by the Maine Milk Commission. § 4542(1). The index price is $16 per hundredweight ("cwt"). When the basic price of milk drops below $16 cwt, the amount of the tax varies along a graduated scale from $.01 per quart (when the basic price is $15.50 to $15.99 cwt) to $.05 per quart (when the basic price is below $14 cwt). § 4543(2). Thus, when the basic price falls, the amount of the tax rises. Since the revenues raised are largely distributed to Maine dairy farmers, the fee subsidizes Maine producers during periods of low producer prices.

Under the pricing scheme administered by the Maine Milk Commission, *see* 7 M.R.S.A. ch. 603, the amount of the excise tax is added, not to the minimum price paid to producers by dealers, but to the minimum wholesale price paid to dealers by retailers. § 2954(2)(B). The minimum retail price, in turn, is fixed in reference to the minimum wholesale price. § 2954(2)(C). Thus, the statutory minimum price paid by consumers of milk in Maine reflects the full amount of the tax.[3]

Maine dairy farmers ship approximately one half of their production out of state as raw liquid milk to be processed and retailed outside of Maine.[4] The other half, processed and ultimately sold to consumers in Maine, accounts for over 95% of all in-state retail

---

1. I previously ruled that although the Act refers to its impost as a tax, the levy constitutes a fee for purposes of the Anti–Injunction Statute, 28 U.S.C. § 1341.

2. Ninety-four percent of the funds collected from the tax are distributed to Maine milk producers; four percent of the funds are earmarked for the Women, Infants and Children Special Supplemental Food Program of the United States Child Nutrition Act; and two percent of the funds are dedicated to cover administrative costs of the tax. § 4544(2).

3. For example, the minimum wholesale price set by the Maine Milk Commission in Order # 93–03, effective Feb. 28, 1993, was $1.78 per gallon. The excise tax per gallon amounted to $.16. The retail margin was set at $.20. Adding these sums together, the minimum retail price totalled $2.14 per gallon.

4. This milk is not subject to the tax because it never becomes subject to minimum retail prices set by the Maine Milk Commission. § 4543(1).

sales of liquid milk. The plaintiff, Cumberland Farms, together with a few other processors, accounts for the rest of the in-state wholesale and retail sales, its milk being primarily produced and wholly processed out of state and shipped to Maine in packages for sale to consumers.

Cumberland Farms is an "integrated operation," 7 M.R.S.A. § 2951(4–A), in that it purchases raw milk from producers, processes the milk at its own facilities, packages the milk, ships the packaged milk to its own retail stores, and sells the milk directly to consumers. Within the Maine milk industry, Cumberland Farms is unique in this regard. Cumberland Farms is also unique for its retail sale in Maine of milk produced and processed outside the state. This gives Cumberland Farms a potential competitive advantage over in-state retailers of Maine milk, because the minimum producer price of milk produced in southern New England is less than the minimum price paid to producers in the state.[5]

### STANDING

■ As an initial matter, both the defendants and the intervenors[6] challenge Cumberland Farms's standing.[7] The nub of their argument is that since the burden of the dairy tax is passed on to consumers, Cumberland Farms has suffered no injury-in-fact and thus has no right to bring an action. *See Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). But Cumberland Farms is liable for the tax and must return payment to the state. This suffices to confer standing on Cumberland Farms. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 267, 104 S.Ct. 3049, 3053, 82 L.Ed.2d 200 (1984). I need not decide, therefore, whether current market conditions permit Cumberland Farms to pass the entire tax on to consumers.

### COMMERCE CLAUSE

■ The Commerce Clause limits economic protectionism by restricting state-imposed regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. *Wyoming v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992). In order to determine whether Maine's law will withstand a

---

5. This advantage results from the overlap of federal and state regulation. In general, the federal government establishes the minimum producer price of milk paid to dairy farmers in various geographical marketing areas known as "orders." *See* 7 U.S.C. § 608c. For instance, most of New England is encompassed within what is know as the New England Marketing Area, and the producer price of milk in that area is governed by Federal Milk Order No. 1. The state of Maine, however, is not included in any federal marketing area, and is not governed by federal milk orders. Nevertheless, milk produced in Maine and shipped into federal marketing areas for sale is subject to federal minimum producer prices. Similarly, federal minimum producer prices apply to milk originally sold for processing in a federally regulated market area and subsequently shipped to Maine for retail sale. All of the milk sold by Cumberland Farms in Maine falls into this latter category.

As to milk produced, processed, and sold in Maine, the Maine Milk Commission sets minimum producer prices. 7 M.R.S.A. §§ 2953–2954. In determining the minimum wholesale price to be paid to Maine dairy farmers, the Commission starts with the Federal Milk Order No. 1 price and adds an "over-order premium" reflecting various costs particular to Maine including the increased costs of production.

§ 2954(2)(A). The Maine Milk Commission also sets the minimum dealer and retail prices for milk sold in Maine regardless of where it was produced and processed. The minimum wholesale price paid to dealers is calculated by adding a dealer margin and the amount of the handling tax to the minimum producer price. § 2954(2)(B). The minimum retail price paid by consumers is calculated by adding a retail margin to the minimum wholesale price. § 2954(2)(C). The result is that Cumberland Farms's minimum producer prices are regulated by federal order, and are thus lower than minimum producer prices in Maine (not considering any effects of local taxation or fees) even though Cumberland Farms's minimum retail milk prices are regulated by the Maine Milk Commission.

6. The intervenors, comprised principally of Maine dairy farmers, include Boston Milk Producers, Inc.; Agri-Mark, Inc.; Wayne Hapworth; Priscilla Rowbotham; Harold Larrabee; and Adrian Wadsworth.

7. The defendants also request that I reconsider my decision not to dismiss the case pursuant to the Tax Injunction Act, 28 U.S.C. § 1341. The defendants, however, fail to advance any new arguments regarding this issue, and their request to reconsider is DENIED.

Commerce Clause challenge, I must determine whether it directly discriminates against interstate commerce, or indirectly affects interstate commerce and regulates evenhandedly.[8] *See Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). If the regulation fits the first category, it is unconstitutional; if it fits the second category, I must compare the burden on interstate commerce to the local benefits.[9] *Id.* If fits neither category, it passes constitutional muster.

Cumberland Farms argues that the Maine statute places out-of-state producers at a competitive disadvantage in the Maine market, lessens price competition among dealers operating within the state, and insulates Maine farmers who supply milk for retail sale in Maine from the fluctuations of the regional and national markets. None of these contentions bears scrutiny.

The Act applies a uniform excise tax to all milk sold in Maine, regardless of its source. Thus, the Act does not affect handlers' economic decisions about where to purchase raw producer milk. The resulting subsidy paid to Maine producers may provide them with an advantage or insulate them from regional price fluctuations, but the United States Supreme Court has held that to be permissible: "The Commerce Clause does not prohibit all state action of that description in connection with the State's regulation of interstate commerce. Direct subsidization of domestic industry does not ordinarily run afoul of that prohibition; discriminatory taxation of out-of-state manufacturers does." *New Energy Co. v. Limbach*, 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988) (emphasis omitted). Similarly, the Act does not lessen

price competition because the fee is levied evenhandedly on all dealers in the state. There are no exemptions for milk that is intended for sale in Maine. To the extent that the higher minimum retail price is actually translated into higher prices for consumers, all dealers and retailers are similarly affected.

Cumberland Farms also asserts that the Act exempts all Maine milk shipped in bulk out of state for sale elsewhere, thus improperly preventing the subsidy to Maine dairy farmers from hurting their competitive position in the interstate market. According to Cumberland Farms, this discriminates economically against milk produced outside the state and thus violates the Commerce Clause.

Maine, however, is entitled to enact laws "that have the purpose and effect of encouraging domestic industry." *Bacchus Imports, Ltd.*, 468 U.S. at 271, 104 S.Ct. at 3055. What Maine may not do is burden foreign producers by attempting to tax them or indirectly subject them to Maine's pricing scheme. This is where other states' laws have gone astray. For instance, the New York regulation invalidated in *Baldwin* attempted to regulate the price paid to producers of milk outside the state by requiring that the producer price conform to New York's prices. *Id.* 294 U.S. at 521–22, 55 S.Ct. at 500. The regulation struck down in *Marigold Foods, Inc.* indirectly required Minnesota dairy processors to pay Minnesota's minimum price even on milk purchased from out-of-state producers, thereby negating the economic advantage that foreign dairy farmers with lower prices had over Minnesota dairy farmers. *Id.* 468 U.S. at 272, 104 S.Ct. at 3055. The regulation struck

8. Since the challenged impost is levied on products that move in interstate commerce, I assume that the Act has some effect on interstate commerce.

9. I do not expressly follow the four part analysis for a tax on interstate commerce described in *Maryland v. Louisiana*, 451 U.S. 725, 754, 101 S.Ct. 2114, 2132, 68 L.Ed.2d 576 (1981), because of my ruling that the impost is a regulatory fee rather than a tax for purposes of the Tax Injunction Act. But the result would be the same under that approach. *See Opinion of the Justices*, 601 A.2d 610, 617–19 (Me.1991). Under

the *Maryland* approach, a state's right to tax interstate commerce is limited, "and no state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State." *Id.* 451 U.S. at 754, 101 S.Ct. at 2133. Construing the impost levied by the Dairy Act as a tax, rather than a fee, I find that the first, second, and fourth parts of the four-part *Maryland* test are easily satisfied. *See* 601 A.2d at 617. The remaining part of the analysis is common to the inquiry I pursue here.

down in *McGuire* had precisely the same effect on producers of milk outside of New York. *Id.* at 1251–53.

The Maine Dairy Farm Stabilization Act works differently. The Act imposes a uniform regulatory fee at the wholesale or retail level on all handlers of packaged milk in Maine. The impost is not based on the differential between in-state and out-of-state minimum producer prices. The Act neither equalizes the price paid to foreign or in-state producers nor creates any difference between the minimum dealer or retail price of Maine or foreign milk. Thus, the Act does not prevent foreign producers who sell their milk for less to Cumberland Farms from enjoying a price advantage over Maine dairy farmers. Furthermore, the Act leaves intact Cumberland Farms's advantage in selling milk on the Maine market that it has purchased at a lesser cost from out-of-state producers. Interstate commerce is not unfairly burdened by the exemption for milk produced in Maine but sold out-of-state. It is true that the proceeds are then used to benefit Maine milk producers, but current precedents permit this kind of economic protectionism.

Finally, Cumberland Farms argues that it is required to pay from its profit a subsidy to Maine dairy producers from whom it does not purchase milk. But under the Act the potential profits of all Maine milk retailers are similarly infringed by the impost. As was true of the nondiscriminatory use tax upheld in *Henneford v. Silas Mason Co., Inc.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937), "[e]quality is the theme that runs through all the sections of the statute." *Id.* at 583, 57 S.Ct. at 527. The "stranger from afar" is subject to no greater burden as a consequence of the fee than the "dweller within the gates." *Id.* at 584, 57 S.Ct. at 527.

As a result, I conclude that the levy imposed by the Act does not directly or indirectly affect interstate commerce and that it, along with the subsidy of Maine producers, does not violate the Commerce Clause.

## SUPREMACY CLAUSE

█ Cumberland Farms argues that the Act is contrary to federal milk regulation because imposition of the fee effectively raises the federal minimum price it pays to producers outside of Maine for milk eventually sold on the Maine market. I have already found, however, that the Act does not have the effect of raising milk prices outside of Maine. It therefore does not conflict with federal law.

## DUE PROCESS CLAUSE

█ Cumberland Farms maintains that the Act violates the substantive requirements of the Due Process Clause because it is arbitrary and unrelated to the legislative objectives that led to its enactment. It takes an extraordinarily bad piece of legislation to run afoul of this requirement in the area of economic regulation, *see Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955), and this Act comes nowhere near the line.

█ Cumberland Farms also contends that the Act violates the procedural requirements of the Due Process Clause because it establishes minimum prices without the hearings required by legislation governing operation of the Maine Milk Commission. Conflicts between two statutes, however, raise questions of statutory interpretation, not a constitutional violation. There is no procedural due process violation.

## CONCLUSION

Accordingly, for all the foregoing reasons, the plaintiff's motion for summary judgment is **DENIED**. The defendants' and intervenors' motions for summary judgment on the merits are **GRANTED**.[10]

**SO ORDERED.**

---

10.  Cumberland Farms's motion to strike the affi-    davit of Wellington is **GRANTED**. The intervenors'

motions for oral argument and to submit a sup-     plemental memorandum are **DENIED**.